282 So.2d 223 (1973)
Charles BURGE
v.
STATE of Mississippi.
No. 47234.
Supreme Court of Mississippi.
June 29, 1973.
Rehearing Denied September 24, 1973.
*224 James T. Bridges, Belzoni, for appellant.
A.F. Summer, Atty. Gen., by T.E. Childs, Jr., Special Asst. Atty. Gen., Jackson, for appellee.
PATTERSON, Justice, for the Court:
Charles Burge and George Burge, his father, were indicted in Humphreys County for the March 12, 1972, murder of James Gilmer. The causes were consolidated on the motions to suppress, but a severance was granted for trial and Charles Burge was convicted and sentenced to life in the state penitentiary.
On March 21, 1972, Herbert McRaney, while driving on Townsend Lake Road in Humphreys County, observed a body lying in Alligator Slough near Gunn Bayou. He notified the sheriff's office and the ensuing investigation revealed it to be that of James Gilmer. A search of the area near the bayou disclosed two expended shotgun shells.
An autopsy was performed by Dr. Kenneth Collins, a licensed physician and pathologist. He testified that the deceased was a large man approximately 45 to 50 years of age, and that a superficial examination of his body disclosed a large cut on the left shoulder as well as a circular penetrating wound in the left lower back just below the rib cage. The latter wound, upon being probed, disclosed shotgun pellets. It was the doctor's opinion that Gilmer's death was the result of the loss of blood and trauma from the deep wound.
On March 13, 1972, prior to the discovery of Gilmer's body, Charles Burge, then 17 years of age, was taken into custody by the police of Belzoni for driving an automobile without a license and having beer in his possession. The following day Honorable James T. Bridges of the Humphreys County Bar was appointed to represent him on these charges. The trial was conducted on March 21 and Charles Burge, hereinafter Burge, was adjudged to be a delinquent youth. He was released, however, upon his own recognizance until the youth court judge could ascertain whether a vacancy existed at Oakley Training School so he could be sent there for rehabilitation.
About the time of the delinquency hearing the body of James Gilmer was found in Gunn Bayou and Burge, just released on his own recognizance, was picked up by *225 the sheriff. He was informed that he was under investigation for Gilmer's death and prior to questioning was advised of his constitutional rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). This consisted of the warnings necessary under the decision, but concluded with the statement, "We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court." Burge acknowledged this warning by, "I signed a paper to my right.", and by testifying that he was advised of his rights.
This inquiry revealed that previous to the time that Burge was charged with being a delinquent Gilmer had been reported missing from his usual haunts and an investigation concerning his whereabouts was being conducted by the sheriff. A deputy, James Everett, being advised that Gilmer's automobile was in the possession of Burge, questioned him concerning the whereabouts of Gilmer. He testified on the motions to suppress, as well as the trial in chief, that Burge told him that Gilmer had stated he was going to Arkansas since he was "so deep in debt." He also stated that Burge was in possession of Gilmer's automobile.
On a later occasion Burge was again questioned concerning the absence of Gilmer. This produced the following testimony by Everett:
The second time he told me, he said, "Have you been down on the Snake Creek Road?" I said, "No." He said, "Well you might find him in some of those sloughs or woods out there on Snake Creek Road."
Thereafter, though doubtless other officers were present, he was interrogated by Patrolman Pressgrove, a criminal investigator of the Mississippi Highway Patrol. The investigation began March 22, included the 23rd, and culminated on the 24th when Burge was transported to the city of Jackson by Pressgrove to undergo a lie detector test.
Pressgrove testified on these motions that he aided the sheriff in the investigation concerning the death of Gilmer. He stated that on the evening of March 21 the sheriff requested his assistance and the following day he interrogated George Burge, the father of the appellant, who told him that he did not presently own a shotgun, but that he had four or five shotgun shells in his house and that he had no objection to Pressgrove's examining them, giving permission for his wife to show the shells to him. He testified that he then went to the home and obtained the written consent of Mrs. Burge to search the entire house. Though a search was conducted pursuant to this deception, apparently no clues were discovered since no mention is made thereof.
He stated that he interrogated the appellant on March 22, 23 and 24. On the last date he transferred Burge to Jackson for a lie detector test and returned him to Belzoni. Thereafter, on April 4, while conveying Burge, a prospective witness in the preliminary hearing of his father for the murder of Gilmer, from Oakley Training School to Belzoni, he testified the following voluntary conversation occurred:
Q. All right, in transporting this Charles Burge from Oakley to the City of Belzoni, would you please relate what happened?
A. Well, we left Oakley coming back to Belzoni, and just north of Oakley there was a little small country store. I asked Charles if he had any cigarettes, and he said, "No, sir." I asked him if he wanted me to buy him a pack of cigarettes and he said that he did, and I stopped and bought him a package of cigarettes. We left and started to Belzoni. We were talking about farming and all. He told me about how much he liked to drive tractors, how much he liked to be in a field, and just general discussion, and north of Vicksburg, Mississippi, he told me, he said, "Mr. Pressgrove, the gun is up under the house, up *226 under the house where I live with my mother and daddy." I brought him straight on to the Humphreys County Sheriff's Department. He, along with Deputy Jim Everett went up and knocked on the door and his mother, Rosie Mae Burge, came out to the car. We asked her if she would mind if we looked under the corner of the house to see if there was a gun under there. She said that she did not care whatsoever. At that time, she signed another Search by Consent, which is on a form.[1]
Pressgrove then testified that Burge pointed to the corner of the house underneath which the gun was found in a dismantled condition. Upon questioning, he repeated that the statement of Burge concerning the gun was volunteered and was not the product of interrogation. On the other hand, Burge testified that he recalled the statement to have been made in the office of the sheriff and that it was in response to questioning. He was not used as a witness in the preliminary hearing and was later indicted with his father for murder.
Though Attorney Bridges had been appointed to represent Burge in the youth court proceeding resulting in the adjudication of delinquency on March 21, he was not notified that his client was, almost immediately thereafter, incarcerated for investigation of murder; neither was he notified of any of the subsequent interrogations and only on the day of Burge's arraignment for murder did he learn of these investigations. There is nothing in the record to reflect when the attorney's services for Burge in the youth court case were to terminate though it does show that the sheriff's office was aware of his appointment although Pressgrove was not. The testimony of Burge discloses that he was notified of his right to an attorney, but that he did not request one nor did he notify Pressgrove of his representation by Attorney Bridges.
The motions of George and Charles Burge to suppress the statement relating to the location of the gun and its introduction were heard together and at its conclusion the lower court sustained the motion of George Burge, the father, but overruled that of Charles. A severance was then granted for the trial.
Burge presently contends in support of his motion that the Miranda warning given him which concluded with the words "We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court", was insufficient and ineffective since it left the impression with him that he was entitled to an attorney only upon his trial, but not during interrogation. In isolation, this argument is persuasive, but when considered in context with the remainder of the related warning, a part of which advised of the right to an attorney before responding to questioning, the plausibility disappears. In the recent cases of Holifield v. State, 275 So.2d 851 (Miss. 1973) and Evans v. State, 275 So.2d 83 (Miss. 1973), we held this type of warning not to be error, relying primarily upon Mayzak v. United States, 402 F.2d 152 (5th Cir.1968).
Moreover, a volunteered statement, voiced without prompting or interrogation, is admissible in evidence if made prior to the warning and of course if it were voluntarily and spontaneously made subsequent thereto, it would remain admissible in evidence. Fabian v. State, 267 So.2d 294 (Miss. 1972); Boyles v. State, 223 So.2d 651 (Miss. 1969); Spurlin v. State, 218 So.2d 876 (Miss. 1969); and Nevels v. State, 216 So.2d 529 (Miss. 1968). Officers in the presence of a suspect, either prior to arrest or thereafter, are not required to turn a deaf ear to the voluntary utterances *227 of such person and they are not rendered inadmissible by Miranda. We conclude the warning given to be sufficient to meet the standards set forth in Miranda, but even if this were not so, the lower court found the statement of Burge relating to the location of the gun to have been voluntarily made and since this finding is supported by credible testimony, it was admissible in evidence. We therefore conclude this assignment of error to be without merit.
We think, however, since there exists a split of authority between some of the federal circuits, as well as several of the states, on the adequacy of similar Miranda warnings, that peace officers would be well advised to delete the underscored portion from the quotation "We have no way of giving you a lawyer, but one will be appointed for you if you wish, if and when you go to court" from future warnings since the final decision on the point will apparently have to be made by the United States Supreme Court. See United States v. Cassell, 452 F.2d 533, 541, Footnote 8[2] (7th Cir.1971); and Williams v. Twomey, 467 F.2d 1248 (7th Cir.1972).
The appellant next argues on his motion to suppress that all statements made by him and all evidence discovered through his statements between March 21, 1972, the date he was adjudged a delinquent, and the time of his indictment, July 5, 1972, should be suppressed since they were made in the absence of his counsel. He cites in support of this argument, to which the State did not respond, the case of Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), a federal case. The Court in Massiah with regard to the Sixth Amendment stated:
... We hold that the petitioner was denied the basic protections of that guarantee when there was used against him at his trial evidence of his own incriminating words, which federal agents had deliberately elicited from him after he had been indicted and in the absence of his counsel... . (377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250.)
Although this case followed the decision of Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959), a state case, which also condemned evidence elicited after indictment at a time when the defendant was entitled to the advice of counsel, we do not feel constrained to follow Massiah since the facts upon which it relied are distinguishable from the present. In Massiah the advice of retained counsel was found to be essential to a fair trial under Fourteenth Amendment standards on the charges presented by the indictment which led to the attorney-client relationship and the opinion was limited by its terms to:
... All that we hold is that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial. (377 U.S. at 207, 84 S.Ct. at 1203, 12 L.Ed.2d at 251.) (Emphasis added.)
Here counsel was appointed for a delinquency charge, an offense separate and distinct from the murder charge laid in the indictment. Moreover, the delinquency proceeding had been concluded at the trial level. Under these circumstances we do not think the appointment sufficiently broad to embrace within it the separate charge of murder even though the time element of the two offenses overlapped. We conclude that Massiah is not controlling. In reaching this result we rely partially upon the fact that Burge, when advised that he was being investigated for murder, did not request an attorney though he was informed of his right thereto. We do not wish the foregoing to be thought a commendation of the sheriff's department for its failure to advise the defendant's attorney in the youth court proceeding of its *228 murder investigation, particularly in view of the accused's age and the closeness in time of the two charges. Indeed, it would have been most appropriate to notify this youth's attorney so that his constitutional prerogatives could have been preserved to him or more knowledgeably waived after conferring with his counsel. We conclude, however, from the record before us on the motion to suppress that it was properly overruled.
The evidence on the trial in chief is circumstantial, and since the appellant challenges its sufficiency by a motion for a directed verdict, it must be somewhat detailed.
As mentioned, the body of James Gilmer was discovered on March 21, 1972, in Alligator Slough near Gunn Bayou, both of which are adjacent to Townsend Lake Road in Humphreys County.
The testimony of Deputy Everett and Patrolman Pressgrove was similar in all essential details to that of the testimony on the motion to suppress and will not be repeated. It indicates additionally, however, that the expended shells, discovered in the area where the body was found, and the gun, removed from under the house of George Burge, were sent to the Mississippi Crime Laboratory for examination.
The evidence of Dr. Collins is elaborated somewhat to include his testimony that he was not an expert in ballistics, but that he was reasonably familiar with guns.
The remaining evidence of the State is outlined by the following witnesses:
James Childs testified that he was acquainted with Burge and had occasion to see him on Saturday night, March 11, 1972, at Childs' Grocery in the presence of James Gilmer. He explained the meeting on this occasion to have been under the following circumstances. He testified that Burge called the grocery on the phone and that he talked with him and recognized his voice. According to the witness the purpose of the call from Burge was to determine if Gilmer was present, and to speak with him. He stated that he awakened Gilmer from a drunken stupor and that he supposed Gilmer talked to Burge.
He then testified that Burge called about three more times to talk to Gilmer and following their last conversation Gilmer left in his automobile and later returned to the grocery with Burge where they remained until about two o'clock Sunday morning. At this time the witness Childs, a Mrs. Brooks, Dorothy Brooks and Roy Haven were driven to their homes in Gilmer's automobile driven by Burge. He testified that Roy Haven was first carried to his home on Townsend Lake Road and thereafter he and the two Brooks women were taken to the abode of Mrs. Cornelia Brooks on "Old" Highway No. 12 at about 2:30 a.m., and Burge and Gilmer then departed toward Belzoni.
The next morning he inquired of Burge, who was driving Gilmer's automobile, where Gilmer was. Childs then stated: "He said he carried him out to Shoats' house, a Negro house, on Bob Millwood's place." He then added that for the remainder of the day and until Monday morning he was with Burge, Charles and Glen Evans, and Eddie McKee on a fishing and camping expedition to Lake Washington.
Dorothy Brooks corroborated the testimony of Childs to the extent that she saw Burge and Gilmer together at Childs' Grocery and she and others were driven home in the Gilmer automobile about two o'clock on Sunday morning.
The next witness was Tom Robertson who stated that he lived on Townsend Lake Road and that he had occasion to see Burge on this road during the early hours of Sunday, March 12. He approximated the time as between 3:30 and 4:00 and that Burge, who was alone, appeared to be changing a tire on a Pontiac automobile.
Mrs. Selby Monk testified that she was a next door neighbor to George Burge and *229 his son Charles and that on Sunday morning, March 12, she observed a light blue car with a white top in which she had previously seen James Gilmer, parked at the Burge home. She stated the car was driven during the week by both Charles and George Burge. On cross-examination she admitted that she had observed Charles driving the automobile prior to March 12 and there was nothing unusual about his use of the car.
William Ates, employed by the City of Jackson and the Mississippi Highway Patrol as a criminologist, was the next witness. He was qualified and accepted as an expert witness from evidence showing that he was a graduate of the University of Southern Mississippi and had become proficient in the use of a microscope while studying biology. His background indicates that he has been employed as a criminologist for eight years and by reason of this occupation had extensive practice in the study of weapons and had in fact testified in many cases. He gave testimony concerning the field of forensic ballistics, the basic comparison microscopically of a known object against a questionable object, in detail. From this educational background he was permitted to testify as an expert over the objection of the defendant.
The essence of his evidence was that the gun delivered to him by Pressgrove was the weapon which had fired the two shells found by the officers in the vicinity of Gunn Bayou. He explained his tests for the comparison study to have included the assembly of the gun, firing it and then comparing microscopically the shell hulls from the tests with those found near the bayou. The subsequent examination revealed identical gun ejector "claw" marks upon the test shells fired in the gun and those forwarded to him. It was his expert opinion, therefore, that the gun submitted to him fired the various shells.
The above testimony is the entirety of the evidence submitted in the case.
Burge contends that the lower court erred in permitting Dr. Collins to testify that he found "shotgun pellets" within the body of Gilmer since the doctor was not qualified as a ballistics expert. We conclude this assignment to be without merit since we do not think the expertise of one proficient in ballistics necessary to identify shotgun pellets as such, particularly in view of the fact the doctor stated he was reasonably familiar with guns.
The argument is next advanced that the lower court permitted Witness Ates to invade the province of the jury when he determined the shells fired in his tests bore similar scratches to those in question. This argument is based upon the premise that the jurors should have made this determination by viewing the shells. We reject this assignment since it appears to us that the lower court properly found the witness to be an expert and properly permitted to be introduced his opinion relating to the gun and shells.
The next complaint is that State's Instruction No. 1 was improperly given by the court and the defendant's Instructions 6 and 8 were improperly refused by the court. We think it sufficient to state that in examining the numerous instructions granted in the cause, particularly the defendant's Instructions 10, 12 and 21, there exists little doubt, if any, that the jury was properly instructed and we find no error in the granting or refusal of the instructions complained of.
SUGG, Justice, for the Majority:
The Court is in unanimous agreement on the assignments of error covered in the portion of the opinion written for the Court by Justice Patterson, but we are unable to agree on appellant's assignment of error that the circumstantial evidence offered by the State was insufficient to support a verdict of guilty.
*230 In Johnson v. State, 23 So.2d 499 (Miss. 1945), this Court had before it the question of the sufficiency of circumstantial evidence and held as follows:
... The question must be determined by a jury in each particular case within the principles prescribed by law; within these limitations, the power of circumstances to satisfy the understanding and conscience of the jury beyond a reasonable doubt and to the exclusion of every other reasonable hypothesis consistent with innocence, is always the test of the sufficiency of circumstantial evidence.
It was long ago held by this Court in the case of Browning v. State, 33 Miss. 47, citing Cicely v. State, 13 Smedes & M. 202, 211, and the principle has been uniformly adhered to since that time, that the sufficiency of circumstantial evidence is peculiarly for the determination of the jury, "because it is always solemnly to be weighed and acted upon by their understandings and consciences, and is, from its very nature, the subject of inferences and conclusions in their minds," and that "a verdict, therefore, found on circumstantial evidence, will always be permitted to stand unless it is opposed by a decided preponderance of the evidence, or is based on no evidence whatever." (23 So.2d at 500.) (Emphasis supplied.)
See also Bone v. State, 207 Miss. 868, 43 So.2d 571 (1949); Dickins v. State, 208 Miss. 69, 43 So.2d 366 (1949).
Applying such test, the evidence is adjudged to be sufficient to support the verdict of the jury.
Affirmed.
GILLESPIE, C.J., and ROBERTSON, WALKER and BROOM, JJ., concur.
PATTERSON, Justice (dissenting):
The ultimate question for decision is whether the evidence of the State was sufficient to sustain a guilty verdict on a murder charge. With deference to the majority I believe it to be insufficient and that justice would be served by directing another jury to pass upon the question.
While it is true that circumstantial evidence in proper cases has the force and effect of direct evidence, mere circumstances of themselves are not the equivalent of evidence. The dignity of evidence is reached only when the circumstances are so unequivocal that every hypothesis consistent with innocence is removed. As long ago as 1853 in Algheri v. State, 25 Miss. 584, we held:
While circumstantial evidence is in its nature capable of producing the highest degree of moral certainty, yet experience and authority both admonish us that it is a species of evidence in the application of which the utmost caution and vigilance should be used.
... "It is always insufficient, where assuming all to be proved which the evidence tends to prove, some other hypothesis may still be true, for it is the actual exclusion of every other hypothesis which invests mere circumstances with the force of truth. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be." (25 Miss. at 589)
This pronouncement remains the law of this state through decisions so numerous their citation would burden the reader and so are not included.
The above statement is not to be construed to indicate that circumstantial evidence may not be sufficient proof of the commission of a crime upon which a conviction may be based. Harris v. State, 218 Miss. 259, 67 So.2d 302 (1953). It is to point out that in order to justify a conviction by circumstances alone they must not *231 only be true in fact, but must be such as to exclude every reasonable theory that the defendant is innocent. Dunbar v. State, 159 Miss. 603, 132 So. 748 (1931). This principle has been held to be true even where the state's case was sufficient to survive the defendant's request for a peremptory instruction. Quarles v. State, 199 So.2d 58 (Miss. 1967); Mister v. State, 190 So.2d 869 (Miss. 1966).
The cogent points of the State's evidence are reproduced so the pertinent evidentiary rule may be considered in relation to it: (1) The body of James Gilmer was found in Alligator Slough on March 21, 1972. (2) Death was caused by a shotgun wound. (3) The last person to be seen with Gilmer prior to his death was Burge, the accused. (4) Burge was seen alone in a Pontiac automobile on Townsend Lake Road several miles from Alligator Slough in the early morning hours of the day the murder was alleged to have occurred. (5) The following morning Burge was driving Gilmer's automobile. (6) Burge told the officers that Gilmer told him he was going to Arkansas. (7) On another occasion Burge, in response to questions by officers, stated: "Well you might find him in some of those sloughs or woods out there on Snake Creek Road." (8) Burge told the officer, "The gun is up under the house, up under the house where I live with my mother and daddy." (9) The gun was determined to be that which fired the shells found near Alligator Slough.
The record also discloses the following: (1) Burge was a seventeen-year-old youth. (2) Burge and Gilmer were friends. (3) There was nothing unusual about his use of Gilmer's automobile as he had used it fairly frequently in the past. (4) Burge's father was also indicted for the murder. (5) No motive was disclosed for Burge to kill Gilmer. (6) There is nothing to connect Burge with the gun other than the statement as to its location. (7) Burge remained in the sparsely settled community subsequent to the death of Gilmer.
Correlating this evidence to the rule in Algheri, supra, and in an attitude most favorable to the State, the strongest statement that can be logically made, in my opinion, is that Burge probably killed Gilmer. It seems equally probable, however, that he was a youthful accessory to the murder with knowledge of the facts relating to the shooting rather than being guilty of the deed himself. On either of these "probabilities" or hypotheses criminal convictions cannot and should not rest. In Moore v. State, 188 Miss. 546, 549, 195 So. 695 (1940), we held:
The deceased was shot at night through a window of her house. No one saw the person who fired the shot, the evidence as to who did so being wholly circumstantial; consequently in order for the appellant to be convicted the evidence must exclude every reasonable hypothesis other than that of his guilt. A finding that the appellant shot the deceased must rest, in the last analysis, on the testimony of Rufus Peeler and inferences drawn therefrom in the light of the other evidence. All that this witness said may be true, nevertheless the utmost that could be inferred therefrom, though reenforced by the other evidence, is that the appellant probably shot the deceased, and verdicts in criminal cases cannot rest on probabilities. "It is the actual exclusion of every other [reasonable] hypothesis which invests mere circumstances with the force of truth. Whenever, therefore, the evidence leaves it indifferent which of several hypotheses is true, or merely establishes some finite probability in favor of one hypothesis rather than another, such evidence cannot amount to proof, however great the probability may be". Algheri v. State, 1853, 25 Miss. 584. Such in 1853 was and still is the law. Hogan v. State, 127 *232 Miss. 407, 90 So. 99; Harris v. State, 153 Miss. 1, 120 So. 206.
The request of the appellant for a directed verdict of not guilty should have been granted.
At the very least it is my opinion that Burge is entitled to another trial before a different jury. The provisions of Section 1536, Mississippi Code 1942 Annotated (1956) very wisely permit a court in instances of conviction upon dubious facts to direct another jury to pass upon the issue. See Conway v. State, 177 Miss. 461, 171 So. 16 (1936); Pearson v. State, 248 Miss. 353, 158 So.2d 710 (1963); Jolly v. State, 174 So. 244 (Miss. 1937); and Creed v. State, 179 Miss. 700, 176 So. 596 (1937). I believe this to be a proper case for the application of the statute. I reach this conclusion in view of the accused's age, the likelihood that he was dominated in this crime by his father who was also indicted, the lack of motive and the fact that he made no effort to leave the community or evade the questions of the officers. The statements of Burge made to the officers are not confessions. They relate knowledge of the murder and no more.
I have no hesitancy in affirming a conviction when supported by competent and sufficient evidence. I seek the comfort of another jury verdict in the difficult case before us. The graveness of depriving one of his liberty for the remainder of his life solely on circumstantial evidence brings into focus the wisdom of this Court when it admonished in Algheri, supra:
... [Y]et experience and authority both admonish us that it is a species of evidence in the application of which the utmost caution and vigilance should be used. (25 Miss. at 589)
For the reasons stated I dissent from my brethren and would remand this case for another trial before a different jury.
RODGERS, P.J., and INZER and SMITH, JJ., concur in this dissent.
NOTES
[1] There is nothing to contradict the statement of Pressgrove that the search was made by consent of the wife, that is, the search was not conducted pursuant to a judicial warrant.
[2] This footnote indicates the FBI has made such deletion.