495 So.2d 436 (1986)
Ricky R. PAGE and Darlene Ellzey Page
v.
STATE of Mississippi.
No. 56186.
Supreme Court of Mississippi.
July 9, 1986.
Rehearing Denied October 29, 1986.
*437 Mager A. Varnado, Jr., Gulfport, for appellants.
Edwin Lloyd Pittman, Atty. Gen. by Henry C. Clay, III, Sp. Asst. Atty. Gen., Jackson, for appellee.
En Banc.
ROBERTSON, Justice, for the Court:

I.
At the core of this appeal is the question whether law enforcement officials may, consistent with an accused's constitutional right to counsel, conceal a body microphone on a co-defendant and thereby obtain from the accused substantial incriminating statements  and use those statements against the accused at his trial.
Here, the trial judge denied defendant's objection to the State's offer of such an incriminating tape recorded conversation as evidence. This was error, for incriminating statements emanating from such circumstances are inadmissible at the accused's trial. Because in this arson prosecution this tape recording formed a major part of the State's case in chief, we reverse and remand.

II.
On October 26, 1982, shortly after midnight, Gary Hargrove, a lieutenant paramedic with the Gulfport Fire Department, was called to a fire at Charlie's Antiques on 25th Avenue in Gulfport. Upon breaking into the locked building Hargrove and accompanying firemen found two areas that were burning, one in the bottom floor garage area and another on the second floor. Both fires were extinguished within approximately 19 minutes.
Steven Baudier, captain with the Gulfport Fire Department, participated in the subsequent investigation and discovered two vans in the building in which were found containers of gasoline. The containers had no tops on them and had holes punched in them to allow the gas to run out. Lying next to the containers were books of matches into which cigarettes had been inserted and secured under the matches so that when the burning cigarette got to the match heads it would ignite the box of matches. Four setups of this type were located. Two of these devices had not ignited, one had extinguished itself for lack of oxygen, and the other for unknown reasons.
Roy Necaise, Fire Marshall with the Gulfport Fire Department, was called to the scene. Photographs were taken and the owner of the building was identified as Charles Ditcharo. Investigation revealed that Ditcharo had approximately $60,000 structural insurance on the building.
Herbert Hawk and Dewayne Necaise were identified as employees of Ditcharo. Hawk lived in a trailer with Ricky R. Page and Darlene Ellzey, the Defendants below and Appellants here.[1] When he was questioned by Necaise and Wayne Payne, Hawk first claimed that he did not know what the officers were talking about but then admitted his involvement and implicated Ricky and Darlene. The prosecution's theory of the case ultimately was that Ditcharo had hired Ricky to burn the building so he could collect the insurance proceeds. Darlene is said to have assisted Ricky in this incendiary adventure.
Hawk talked with Ricky Page several times after this admission. Some of these *438 conversations were before he and Ricky were arrested and some were after. In the conversations before the arrest Ricky just told him to keep quiet and there would be no evidence and everything would be all right. Hawk said that Ricky offered him $500 and a car to leave town. This is confirmed in the tape recording challenged on this appeal.
After Ricky and Darlene's arrest, and after Ricky's release from custody on $25,000.00 bond, Detective Payne "armed" Hawk with a concealed body microphone and sent him off to talk with Ricky. Thereafter, while the two were watching T.V. at Ricky's house, Hawk engaged Ricky in conversations, the preserved contents of which are the subject of the dispositive assignment of error discussed below. Hawk was at this time under arrest for burglary but not yet for the arson. Detective Payne acknowledged that he had put the mike on Hawk and along with Inspector Necaise monitored the conversation. Ricky made substantial inculpatory statements about this and other crimes.
On October 28, 1983, Ricky Page, Darlene Ellzey and Herbert Hawk were charged with arson of the premises known as Charlie's Antiques in an indictment returned by the Harrison County Grand Jury. Miss. Code Ann. § 97-17-5 (1972). Each entered a plea of not guilty. The charges against Hawk were severed and the case against Ricky and Darlene was called for trial on January 23, 1984.
Laura Ditcharo, sister of Herbert Hawk and wife of Charles Ditcharo (the owner of the antique store) testified that her brother, Herbert, had had a severe drug problem for 13 or 14 years. She had made various arrangements over the years for mental help for him, but the problem was still prevalent. Laura testified that Hawk had called her in January crying about the statement he had given Roy Necaise (implicating Ricky and Darlene in the arson), saying that it wasn't true and that he had put a lot of people in trouble and wanted to get out of what he had done. Hawk said that Roy Necaise was going very hard on him and had pressured him to think of something that would convict Ricky and Darlene.
Randy Page, Ricky Page's brother, testified that Ricky was home the entire evening on the night of the fire as was Darlene. He testified that Herbert Hawk was in and out all evening. He testified that Hawk was addicted to glue and paint thinner and had been sniffing these substances in the bathroom all evening. He testified that Hawk behaved irrationally when he did this and would often break into Goodwill boxes and drag home old TV's and stuff like that. Randy testified that Hawk cried and told him that he had signed a statement against Ricky and Darlene because it was the only way they would let him out of jail, but that the statement was not true. Randy came forth with this alibi defense the day before the trial.
E.J. Entrekin, Herbert Hawk's brother, testified that Herbert told him he testified against Ricky and Darlene because he was high and he told them what they wanted to hear in anticipation that all charges against him would be dropped.
Charles Ditcharo, the owner of the business that burned and Herbert Hawks' brother-in-law, testified that he was not even informed of the fire until the following day. Ditcharo further testified that Hawk had told him that, if he testified against Ricky, he would then be allowed to go scot free.
On rebuttal Hawk testified that Necaise had never offered him anything to testify against Ricky and Darlene Page and that he was positive that he and Ricky and Darlene had set the fire.
The jury found both Ricky and Darlene guilty of arson. Upon these convictions, the Circuit Court sentenced Ricky and Darlene each to the custody of the Mississippi Department of Corrections for a period of ten (10) years. Miss. Code Ann. § 97-17-5 (1972). These consolidated appeals have followed.

*439 III.
At the outset, Ricky and Darlene each claim that the evidence  as to each of them  is insufficient as a matter of law to sustain a conviction. Each here seeks a determination that, because of the evidentiary insufficiency said to be apparent from the record, each should be finally discharged. The point need not detain us. The standards we apply when presented such a proposition are well settled and clear. See, e.g., Gavin v. State, 473 So.2d 952, 956 (Miss. 1985); Winters v. State, 473 So.2d 452, 459-61 (Miss. 1985); Cook v. State, 467 So.2d 203, 209 (Miss. 1985); May v. State, 460 So.2d 778, 781 (Miss. 1984). When these standards are applied to the testimony summarized above, we may only hold that this assignment of error must be denied.

IV.

A.
Appellants' dispositive assignment of error concerns the admission into evidence of the recording of the inculpatory statements Ricky Page made to Herbert Hawk. The circumstances under which the tape recording was obtained need to be made clear.
On December 22, 1982,  almost two months after the fire  Detective Wayne Payne of the Gulfport Police Department enlisted Hawk's services in an effort to obtain information from Ricky Page. Hawk at the time was under arrest for burglary but not yet for arson. Ricky had been arrested but had been released from custody the day before on $25,000.00 bond. Prior to this time Ricky had obtained counsel to assist him in the defense of the arson charge at this time.[2] Officer Payne placed a body transmitter on Hawk who was then dispatched to confer with Ricky, which Hawk did in fact accomplish. Not only was the Hawk-Ricky Page conversation recorded; it was monitored by Detective Payne and Inspector Roy Necaise of the Gulfport Fire Department. Suffice it to say that Ricky made statements preserved via tape recording which were substantially incriminating both with respect to himself and Darlene.
On appeal Ricky assigns as error receipt of this tape recorded statement into evidence on a plethora of grounds. It is necessary that we consider only one: the denial of Ricky's constitutionally secured right to counsel Miss. Const. Art. 3, § 26 (1890)[3]; see also, U.S. Const., Amdts. VI and XIV.
Once proceedings against a defendant reach the accusatory stage, a right to counsel attaches. Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984). For purposes of our state constitutional right to counsel, we define the advent of the accusatory stage by reference to state law. Miss. Code Ann. 99-1-7 (1972) provides for commencement of prosecution as occurring when a warrant is issued as well as "by binding over or recognizing the offender to compel his appearance to answer the offense". See Atkinson v. State, 132 Miss. 377, 96 So. 310, 311-12 (1923); State v. Hughes, 96 Miss. 581, 585-86, 51 So. 464 (1910). It would be totally irrational to suggest that one "bound over" to await the action of the next grand jury had not been accused. Similarly, law enforcement officials have no authority to deny reasonable access to counsel by one arrested, charged, and advised that his release may be secured upon $25,000.00 bond.
If it has not already attached, the right to counsel is surely available to the accused at the time the Initial Appearance under Rule 1.04, Unif.Crim.R.Cir.Ct.Prac., ought to have been held, the "initial appearance", of course, being that of the accused before a judicial officer "without unnecessary delay" following arrest. See *440 also, Miss. Code Ann. § 99-3-17 (Supp. 1985). Without engaging in nice calculations regarding the precise moment of conception, we hesitate little in holding that the right to counsel has attached to one such as Ricky Page who has been arrested, has been released on bond[4], and has in fact secured the services of counsel.[5]
Once the right to counsel has attached, interrogation may not take place absent a knowing and intelligent and voluntary waiver by the accused of his right to counsel. In a myriad of contexts our law refuses to label "knowing" or "intelligent" or "voluntary" that done by one who did not know or have reason to know of the nature and quality of his actions. Here the State's deceit, both in law and in logic, deprives Page's statements of any voluntary character. Put otherwise, law enforcement may not, directly or clandestinely, undertake interrogation in the absence of the accused's attorney without the accused's consent. Cannaday v. State, 455 So.2d at 722; cf. Jones v. State, 461 So.2d 686, 697 (Miss. 1984). These rules are thought necessary to assure the integrity of the accusatory process.
The point may otherwise be made clear. Given all other facts and circumstances of this case, consider that a law enforcement officer had gone to Page's home and sought to engage Page in conversation about the burning of Charlie's Antiques. Before any incriminating statement there obtained would be admissible at trial, the State would have to show that the officer on that occasion advised Page of his Miranda rights and obtained from Page a knowing, voluntary and intelligent waiver. See Rule 1.03, Miss.Unif.Crim.R.Cir.Ct. Prac. The State may not avoid this burden by enlisting the surreptitious aid of a codefendant. In a very practical sense, Hawk acted at the instance of and was the agent of Detective Payne. Anomaly would attend our holding the agent was free of restrictions by which the principal was most assuredly bound. The State in this context may not do indirectly that which it is constitutionally prohibited from doing directly.
By analogy we note Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). In that case a co-defendant elicited incriminating statements from the accused without the latter's knowledge that the co-defendant who was cooperating with government agents by wearing a concealed radio transmitter while conversing with the defendant in a parked car while the defendant was out on bond. The agents had used the transmitter to listen to the conversations with the accused. All of this happened after the accused had been indicted and in the absence of his attorney and without any waiver of counsel. In these circumstances the Court held

*441 that the defendant's own incriminating statements, obtained by federal agents under the circumstances here disclosed, could not constitutionally be used by the prosecution as evidence against him at his trial.
377 U.S. at 207, 84 S.Ct. at 1203, 12 L.Ed.2d at 251.
Massiah furnishes a persuasive analogy to the case at bar[6]. As in Massiah, Ricky had not waived his right to the assistance of counsel incident to interrogation, a right which theretofore had attached. That he had no knowledge or way of knowing that he was being interrogated by one acting for law enforcement authorities  or that his conversation was being monitored by such authorities  effectively negates any argument that Ricky waived his right to counsel or "volunteered" his inculpatory comments. For clarity we note that the incriminating tape recording is not rendered inadmissible by reason of police trickery or deceit, which most assuredly were practiced here. The outcome determinative point is that the recording was obtained under circumstances where Ricky's right to the assistance of counsel, which most assuredly had attached, had not been waived.
We hold that Ricky Page was denied rights secured to him by Article 3, Section 26 of our Constitution when Herbert Hawk, acting at the instance of Detective Payne, elicited self-incriminating words from him after proceedings against Ricky had reached the accusatory stage and in the absence of an effective waiver by Ricky of his right to counsel. Such is the law if the interrogation occurs in a police station. Cannaday v. State, 455 So.2d at 722-23; Jones v. State, 461 So.2d at 697. The rule should be more strictly enforced in cases of surreptitious interrogation where the accused had no knowledge that his words were being recorded and monitored by agents of the state. See Massiah v. United States, 377 U.S. at 206, 84 S.Ct. at 1203, 12 L.Ed.2d at 250. Self-incriminating words secured in violation of the right fleshed out above may not be used as evidence at the accused's trial. The trial judge committed error when he overruled Ricky's objection to admission of the tape recording against him.
Nothing in Phillips v. State, 374 So.2d 824 (Miss. 1979)[7] is to the contrary. In Phillips no claim appears to have been made that the tape recorded conversation was made in violation of the accused's right to counsel, nor is it clear that matters had there proceeded beyond the investigatory stage. The same may be said of our recent decision in Lee v. State, 489 So.2d 1382 (Miss. 1986). Turner v. State, 415 So.2d 689 (Miss. 1982) is a Rule 4.06 discovery case presenting none of the issues *442 raised here. Burge v. State, 282 So.2d 223 (Miss. 1973) concerns a volunteered statement made to one known by the defendant to be a highway patrolman and is thus wholly distinguishable. In McElroy v. State, 204 So.2d 463, 464-65 (Miss. 1967), there is no suggestion that the accused's employer/confessee was an undisclosed agent of law enforcement. Similarly, in Dycus v. State, 440 So.2d 246, 255 (Miss. 1983); and Mansell v. State, 403 So.2d 871, 873 (Miss. 1981), there was no suggestion that the fellow prisoner/confessees had been surreptitiously solicited to act for the prosecution.
Because the tape recorded statement in issue contained substantial inculpatory information, the error of the trial judge is not one anyone would suggest is harmless beyond a reasonable doubt. Jones v. State, 461 So.2d 686, 701 (Miss. 1984). The conviction of Ricky Page of the crime of arson is reversed and the case remanded for a new trial.

B.
The tape recorded statement of Ricky Page constituted pure hearsay as to Darlene. The recording was admitted as proof of the acts spoken of in the conversation between Ricky and Hawk. These acts included those of Darlene who was not present at the time and whose voice, of course, does not appear on the tape. Darlene's name is mentioned twice by Ricky and is referred to in pronoun form by Hawk and Ricky at various points in the recorded conversation. Clearly the statements by Ricky are statements other than ones made by the declarant (Ricky) while testifying at trial, offered in evidence to prove the truth of the matter asserted. As such the statements were inadmissible hearsay. Not falling within any recognized exception to the hearsay rule, the receipt of the tape recording into evidence against Darlene was reversible error.
REVERSED AND REMANDED.
ROY NOBLE LEE, P.J., and PRATHER, SULLIVAN and ANDERSON, JJ., concur.
WALKER, C.J., HAWKINS, P.J., and DAN M. LEE, J., dissent by written opinion.
GRIFFIN, J., not participating.
DAN M. LEE, Justice, dissenting:
In reversing this case because of the admission of the taped conversation between Herbert Hawk and Ricky Page, the majority opinion has extended Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), far beyond its original meaning, and broadened the constitutional right to counsel to include every situation where the defendant makes an admission against interest. Not only is this case being misapplied to state law, it has the effect of overruling almost twenty years of Mississippi jurisprudence. We have considered this very issue many times, and in none of those cases did we find reversal mandated based on the admission of a conversation of the defendant. Lee v. State, 489 So.2d 1382 (Miss. 1986); Dycus v. State, 440 So.2d 246 (Miss. 1983); Turner v. State, 415 So.2d 689 (Miss. 1982); Mansell v. State, 403 So.2d 871 (Miss. 1981); Phillips v. State, 374 So.2d 824 (Miss. 1979); Burge v. State, 282 So.2d 223 (Miss. 1973); McElroy v. State, 204 So.2d 463 (Miss. 1967). I believe that Ricky Page's conversation with a co-defendant was not a "critical stage" of the prosecution, in which he was entitled to a constitutional guarantee of counsel. In addition, in light of this reversal of our holdings in all of the aforementioned cases, I believe the right to counsel as expressed in Massiah needs further consideration. For these reasons, I respectfully dissent.
Since the majority opinion sets out the posture of the case as it comes to us, a detailed recitation is unnecessary here. Several points should be made, however. Herbert Hawk, a police informer, had elicited statements from Ricky Page without police listening in, which were admitted into evidence. These statements consisted basically of Ricky Page telling Herbert Hawk to keep quiet. Herbert Hawk actually *443 helped Ricky Page perpetrate the arson in question. He was allowed to testify to the crime and Ricky Page's involvement. So, it is clear that Hawk was allowed to testify to Page's part in the actual crime and to statements Page made later evincing his desire to cover up his involvement. Herbert Hawk testified that subsequent to Page's arrest and release on bail, he did engage Page in conversation while wearing a transmitter. The microphone broadcast the conversation to a listening police officer, who recorded it.
Hawk was allowed to testify concerning the substance of the conversation. He said the gist of it was that Page would give him $500.00 and a car to leave town. Later, through the police officer who recorded the conversation, the tape was admitted into evidence and played for the jury.
Only the admission and subsequent playback of the tape was assigned as error to this Court. Defense counsel does not contest Hawk's live testimony in any way.
The statements were made at the trailer where Page had lived with Hawk. Hawk testified, outside the presence of the jury, that others were present in the same room with Hawk and Page when the recorded conversations took place, although they did not take part. There is no testimony as to what, if anything, these witnesses heard.
Defense counsel learned of the tape only twenty-four hours before the trial and the tape was not made available to defense until the end of the first day of trial. There is no question this tape was discoverable material which should have been disclosed. The right of discovery must be meaningful if it is to have effect at all, and the circumstances here suggest reversal may be supported on discovery grounds alone. Hentz v. State, 489 So.2d 1386 (Miss. 1986).
The majority, however, relies on the protection afforded a defendant under Miss. Const., Art. III, § 26 (1890). This protection is similar to that afforded under the Sixth Amendment to the United States Constitution. In Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984), this Court stated that this section provides a broad guarantee that:
[T]he accused "need not stand alone against the state at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial."
The aspect of the right to counsel at issue here initially found expression in Massiah. In that case, the Supreme Court reversed a lower court ruling allowing into evidence an incriminating statement made by a defendant to a co-defendant at a time when adversary proceedings had begun and the co-defendant was cooperating with police.
The court relied on three points: first, the right to counsel, to be effective, must exist prior to trial, as well as at trial; Powell v. Alabama, 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); second, counsel is needed when an accused faces police interrogation; Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959); and third, the need for assistance is equally great when an accused faces surreptitious interrogation because the defendant doesn't know when he is being interrogated by a government agent. The Supreme Court has reinforced this holding since Massiah. Maine v. Moulton, 474 U.S. ___, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985); United States v. Henry, 447 U.S. 264, 100 S.Ct. 2183, 65 L.Ed.2d 115 (1980); Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). However, in continuing to rely on Massiah, the court misconstrues the theoretical underpinnings of the right to counsel, unduly hampers law enforcement, and keeps highly probative, reliable evidence from the jury. I see no reason to perpetuate this misunderstanding by making it part of Mississippi law.
Justice Rehnquist, in his dissent in Henry, noted that Powell and other cases have relied on the concept that it is at "critical stages" of the prosecution that the defendant is entitled to the aid of counsel. 447 U.S. at 290-92, 100 S.Ct. at 2197-98, 65 *444 L.Ed.2d at 135-36. Further, he points out that cases decided prior to Massiah demonstrate "that the theoretical foundation of the Sixth Amendment right to counsel is based on the traditional role of an attorney as a legal expert and strategist." 447 U.S. at 293, 100 S.Ct. at 2198, 65 L.Ed.2d at 137. The assistance with legal intricacies which forms the real basis for the right to counsel seems totally lacking when the defendant decides to trust a cohort or stranger. Here, the accused is on an equal footing with the "interrogator," and we are only protecting the accused from himself.
It is only since Massiah that the right to counsel has meant the right not to be held accountable for voluntary admissions made to a police informer. And this right turns, apparently, on the instigation of formal charges. There seems to be no question that the same conduct, and admission of incriminating statements, at issue here would violate no right if the statement came before adversary proceedings commenced. Henry, 447 U.S. at 272, 100 S.Ct. at 2188, 65 L.Ed.2d at 272. Again, Justice Rehnquist appears to me to be correct that no justification exists for this distinction:
While it is true that both the Fifth and Sixth Amendments reflect the Framers' intent to establish essentially an accusatory rather than an inquisitorial system of justice, neither suggests by its terms a rigid dichotomy between the types of police activities that are permissible before commencement of formal criminal proceedings and those that are subsequently permissible. More specifically, there is nothing in the Sixth Amendment to suggest, nor does it follow from the general accusatory nature of our criminal scheme, that once the adversary process formally begins the government may not make any effort to obtain incriminating evidence from the accused when counsel is not present. The role of counsel in an adversary system is to offer advice and assistance in the preparation of defense and to serve as a spokesman for the accused in technical legal proceedings. And the Sixth Amendment, of course, protects the confidentiality of communications between the accused and his attorney. But there is no constitutional or historical support for concluding that an accused has a right to have his attorney serve as sort of guru who must be present whenever an accused has an inclination to reveal incriminating information to anyone who acts to elicit such information at the behest of the prosecution. To the extent the accused is protected from revealing evidence that may be incriminatory, the focus must be on the Fifth Amendment privilege against compulsory self-incrimination. See, e.g., Spano v. New York, supra; Brown v. Mississippi, 297 U.S. 2798, 56 S.Ct. 461, 80 L.Ed. 682 (1936); Ashcraft v. Tennessee, 322 U.S. 143, 64 S.Ct. 921, 88 L.Ed. 1192 (1944).
Henry, 477 U.S. at 295-96, 100 S.Ct. at 2200, 65 L.Ed.2d at 138-39 (Rehnquist, J., dissenting).
In addition, the type of activity involved here necessarily follows, at the very least, an explanation of the defendant's Miranda rights. Thus, the defendant at this point is well aware of his rights and the pending prosecution:
Once the accused has been made aware of his rights, it is his responsibility to decide whether or not to exercise them. If he voluntarily relinquishes his rights by talking to authorities, or if he decides to disclose incriminating information to someone whom he mistakenly believes will not report it to the authorities, cf. Hoffa v. United States, 385 U.S. 293, 87 S.Ct. 408, 17 L.Ed.2d 374 (1966), he is normally accountable for his actions and must bear any adverse consequences that result. Such information has not in any sense been obtained because the accused's will has been overborne, nor does it result from any "unfair advantage" that the State has over the accused: the accused is free to keep quiet and to consult with his attorney if he so chooses. In this sense, the decision today and the result in Massiah are fundamentally inconsistent with traditional notions of the *445 role of the attorney that underlie the Sixth Amendment right to counsel.
Henry, 477 U.S. at 294, 100 S.Ct. at 2199, 65 L.Ed.2d at 137-38 (Rehnquist, J., dissenting).
Perhaps as a response to Justice Rehnquist, the Court in Maine v. Moulton, stated that the accused is entitled to representation at any confrontation with law enforcement or any agent of law enforcement after adversary proceedings have begun. 474 U.S. at ___, 106 S.Ct. at 488, 88 L.Ed.2d at 496. This appears to be a statement that a confrontation with an undisclosed agent is itself a critical stage. However, this does not change my opinion that there remains no justification for calling a conversation with a co-defendant a confrontation and a critical stage of the proceedings.
Justice White, in his dissent in Massiah, was precisely on target when he stated:
Undoubtedly, the evidence excluded in this case would not have been available but for the conduct of [the informer] in cooperation with [law enforcement officials], but is it this kind of conduct which should be forbidden to those charged with law enforcement? It is one thing to establish safeguards against procedures fraught with the potentiality of coercion and to outlaw "easy but self defeating ways in which brutality is substituted for brains as an instrument of crime detection." (Citations omitted). But here there was no substitution of brutality for brains, no inherent danger of police coercion justifying the prophylactic effect of another exclusionary rule. [The defendant] was not being interrogated in a police station, was not surrounded by numerous officers or questioned in relays, and was not forbidden access to others. Law enforcement may have the elements of a contest about it, but it is not a game. (Citations omitted). [Criminal defendants] receive ample protection from the long line of precedents in this Court holding that confessions may not be introduced unless they are voluntary. In making these determinations the courts must consider the absence of counsel as one of several factors by which voluntariness is to be judged. (Citations omitted). This is a wiser rule than the automatic rule announced by the Court, which requires courts and juries to disregard voluntary admissions which they might well find to be the best possible evidence in discharging their responsibility for ascertaining truth.
Massiah, 377 U.S. at 213, 84 S.Ct. at 1206-07, 12 L.Ed.2d at 254-55 (1964) (White, J., dissenting).
Nor is this situation requiring application of the exclusionary rule, since it is not a case "where its remedial objectives are thought most efficaciously served." United States v. Calandra, 414 U.S. 338, 348, 94 S.Ct. 613, 620, 38 L.Ed.2d 561, 571 (1974).
Reporting criminal behavior is expected or even demanded of the ordinary citizen. Friends may be subpoenaed to testify about friends, relatives about relatives and partners about partners. I therefore question the soundness of insulating [the defendant] from the apostasy of his partner in crime and of furnishing constitutional sanctions for the strict secrecy and discipline of criminal organizations. Neither the ordinary citizen nor the confessed criminal should be discouraged from reporting what he knows to the authorities and from lending his aid to secure evidence of crime. Certainly after this case the [informers] will be few and far between; and the [defendants] can breathe much more easily secure in the knowledge that the Constitution furnishes an important measure of protection against faithless compatriots and guarantees sporting treatment for sporting [criminals].
Massiah, 377 U.S. at 211-12, 84 S.Ct. at 1206, 12 L.Ed.2d at 254 (White, J., dissenting).
The majority cites no Mississippi authority which requires us to keep the defendant's statements from the jury. I would not follow the majority in applying Massiah's principles to state law, and would hold *446 the statements made to Herbert Hawk admissible against Ricky Page.
Finally, the majority notes that it is only statements that are the result of interrogation by an agent which are not admissible. This does not make reference to a Miranda type questioning requirement. This concern merely distinguishes what the Supreme Court has labeled the "listening post" exception. See Henry, 447 U.S. at 271, n. 9, 100 S.Ct. at 2187, 65 L.Ed.2d at 123; Maine v. Moulton, 474 U.S. at ___ n. 13, 106 S.Ct. at 488 n. 13, 88 L.Ed.2d at 496. It would appear the amount of questioning necessary to move an agent out from behind the "listening post" is slight, and law enforcement and prosecutors should bear this in mind.
Even if there is some logic in not allowing police to do indirectly what they cannot do directly, there appears little reason to apply this logic only after the accusatory process has begun. As the majority notes in distinguishing Lee v. State, 489 So.2d 1382 (Miss. 1986), and Phillips v. State, 374 So.2d 824 (Miss. 1979), overruled on different grounds, Baker v. State, 391 So.2d 1010 (Miss. 1980), a tape-recorded conversation made during the investigatory stage is wholly admissible.
Gathering this type of evidence is the type of conduct we should seek to encourage, not deter. I think the majority has lost sight of the benefits available to both defense and prosecution when a conversation between informer and accused is tape recorded. As we noted in Phillips v. State, 374 So.2d 824 (Miss. 1979), tape recordings are a valuable tool in cross-examining witnesses who inaccurately recall conversations. 374 So.2d at 826. Tape recordings also provide a sound basis for determining whether an inmate confessee like that in Dycus v. State, 440 So.2d 246 (Miss. 1983), should be allowed to testify. Far from being unfair, tape-recorded conversations have at least the partial effect of protecting the accused from total fabrication which heretofore might be admitted against him. This benefit is narrow, and likely would require us to restrict the use of tape recordings made after adversary proceedings have begun.
But were I to concede that the tape recording should not be admissible, I fear the majority would not stop there. It appears to me the majority would prevent all police informers from testifying. That has never been the position of this Court. Dycus v. State, 440 So.2d 246 (Miss. 1983); Mansell v. State, 403 So.2d 871 (Miss. 1981). Surely there is no justification for denying the use at trial of testimony that the prosecution would ordinarily be able to use simply because there is also a tape recording of the conversation. This disregards the benefits tape recordings may provide to both the prosecution and the defense. It also goes much farther than this case requires. Ricky Page did not assign the admission of Herbert Hawk's testimony as error, and indeed argued in his brief that only the tape recording was admitted in error.
In fact, I question the wisdom of deciding this case on the grounds of denial of the right to counsel when the defense did not assign this as error and neither the State nor the defense briefed this issue for the Court. In such a situation, our procedure has been only to consider "plain error", and the majority strains this, I think, by attempting to forge new exclusionary rules.
I do not believe the circumstances of this case warrant application of the exclusionary rule. The U.S. Supreme Court recently restated that
[T]he core rationale consistently advanced by this Court for extending the Exclusionary Rule to evidence that is the fruit of unlawful police conduct has been that this admittedly drastic and socially costly course is needed to deter police from violations of constitutional and statutory protections.
Nix v. Williams, 467 U.S. 431, 443, 104 S.Ct. 2501, 2508, 81 L.Ed.2d 377, 386 (1984).
For these reasons, I would affirm the trial court in admitting the tape recording. In the alternative, I would reverse and remand for a new trial during which the tape recording itself would not be admissible, *447 but Herbert Hawk would be allowed to testify to the substance of the conversation.
However, I agree with the majority that the tape recording should not have been admitted as to Darlene Page, who was not present during the conversation. Therefore, reversal as to Darlene is required.
WALKER, C.J. and HAWKINS, P.J., join this dissent.
NOTES
[1] Ellzey and Page are married now and Darlene is sometimes referred to as Darlene Ellzey and other times as Darlene Page.
[2] This fact is derived from Ricky's statement preserved via the tape recording (to which the court listened) instructing Hawk to go to his (Ricky's) lawyer's office and tell the lawyer everything he (Hawk) had told the police was a lie.
[3] The point was preserved at trial via Ricky's pre-trial motion to suppress, invoking, inter alia, Miss. Const. Art. 3, § 26 (1890).
[4] Today's holding applies in cases where an accused has been released on bond under Rule 1.06, Unif.Crim.R.Cir.Ct.Prac., as well as where release is obtained following an Initial Appearance under Rule 1.04.
[5] We are very much aware of the fact that a number of recent federal cases have held that the right to counsel secured by the Sixth Amendment to the Constitution of the United States is available only after the initiation of judicial criminal proceeding, i.e., indictment and arraignment. Michigan v. Jackson, 475 U.S. ___, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986); United States v. Gouveia, 467 U.S. 180, 104 S.Ct. 2292, 81 L.Ed.2d 146, 154 (1984). Application of this approach to our state constitutional right to counsel would be wholly unworkable. With grand juries meeting infrequently in many of our rural counties, such an approach would have the right to counsel available to the accused only after many months had passed following arrest. We also take note of the practice in many of our counties of postponing arraignment in order to avoid the impact of our 270 day rule. Miss. Code Ann. § 99-17-1 (Supp. 1985). Adherence to the recently stated federal approach to the right to counsel would, simply put, have the effect of providing that the accused had the right to counsel only after it could be said with reasonable certainty that it would no longer do him any good, i.e., after the point where any competent law enforcement officer would long since have obtained a confession or other inculpatory statement. For these reasons we reject the federal approach and for purposes of today's decision rely exclusively upon state law.
[6] Massiah is still good law insofar as the Sixth Amendment to the United States Constitution is concerned. As recently as April 1, 1986, the Supreme Court in Michigan v. Jackson, 475 U.S. ___, 106 S.Ct. 1404, 89 L.Ed.2d 631 (1986), stated:

Indeed, after a formal accusation has been made  and a person who had previously been just a `suspect' has become an `accused' within the meaning of the Sixth Amendment  the constitutional right to the assistance of counsel is of such importance that the police may no longer employ techniques for eliciting information from an uncounseled defendant that might have been entirely proper at an earlier stage of their investigation. Thus, the surreptitious employment of a cellmate, see United States v. Henry, 447 U.S. 264 [100 S.Ct. 2183, 65 L.Ed.2d 115] (1980), or the electronic surveillance of conversations with third parties, see Maine v. Moulton, supra, Massiah v. United States, 377 U.S. 201 [84 S.Ct. 1199, 12 L.Ed.2d 246] (1964), may violate the defendant's Sixth Amendment right to counsel even though the same methods of investigation might have been permissible before arraignment or indictment. [Emphasis added]
475 U.S. at ___, 106 S.Ct. at 1409, 89 L.Ed.2d at 639-40.
Only four months earlier the Court had unequivocally reaffirmed Massiah in Maine v. Moulton, 474 U.S. ___, 106 S.Ct. 477, 88 L.Ed.2d 481 (1985). Moulton held that an accused's right to counsel was violated by admission in the course of a state prosecution of incriminating statements made by him to his codefendant, a secret prosecution informant, at a meeting of the two to plan defense strategy for the upcoming trial.
[7] Overruled on different grounds by Baker v. State, 391 So.2d 1010 (Miss. 1980).