551 So.2d 77 (1988)
Robert S. MINNICK
v.
STATE of Mississippi.
No. DP-79.
Supreme Court of Mississippi.
December 14, 1988.
Rehearing Denied October 25, 1989.
*79 Leslie C. Gates, Meridian, for appellant.
Mike Moore, Atty. Gen. by Marvin L. White, Jr., Asst. Atty. Gen., and Donald G. Barlow, Sp. Asst. Atty. Gen., Jackson, *80 Charles W. Wright, Dist. Atty., Meridian, for appellee.
En Banc.
DAN M. LEE, Presiding Justice, for the Court:
On September 9, 1986, Robert S. Minnick was indicted by the Grand Jury of Clarke County, Mississippi, for two counts of capital murder, one for the murder of Lamar Lafferty while engaged in the crime of robbery, and the other for the murder of Donald Ellis Thomas while engaged in the crime of robbery. Minnick was also indicted as an habitual offender on both counts. Motion for change of venue was granted, and a bifurcated jury trial was held in Lowndes County on April 6, 7, 8 and 9, 1987. The jury returned a verdict of guilty as charged on both counts; after a sentencing hearing, the jury imposed the death sentence. Minnick appeals his conviction and sentence, assigning numerous errors. We affirm.

FACTS
On April 26, 1986, around 3:30 p.m., Deputy Sheriff Johnny Hopson, Clarke County, arrived at the mobile home of Donald Ellis Thomas (Ellis) in response to a call from the Jasper County Sheriff's office. He observed a puddle of blood, a hat and some mail strewn across the yard. He also observed two young girls in the presence of a Jasper County Sheriff's deputy, Marty Thomas and Desiree (B.B.) Beech. He noticed drag marks starting at the east end of the mobile home that led across the back yard of the mobile home, which he followed to the edge of a gully running behind the mobile home. In the gully he found two bodies. At this point, he secured the premises and called Chief Investigator of the Clarke County Sheriff's Department, J.C. Denham.
Upon being called to investigate, Denham proceeded to interview Marty Thomas, Ellis Thomas' younger sister, and B.B. Beach. Marty and B.B. drove over to Ellis' mobile home between 2:00 and 2:30 on April 26, to play in the gully. Marty drove her older sister's red car. As they drove up the driveway, a white man met them. Marty described him as short, skinny, with a shaved head, blue shirt, tennis shoes, two rotten front teeth, and carrying a pistol. The man told her to hand him the keys, get out of the car, and do as he said if they wanted to live. He marched them both to the back of the trailer, where they saw Ellis' truck, a big black man, and a body lying on the ground. Marty recognized the body as Lamar Lafferty. The black man carried a rifle or a shotgun. The white man took them inside the trailer through the back door, where they saw Brandon Lafferty, Lamar's two-year-old son, sitting on the couch. The white man made them lie on the floor in the den, on their stomachs, as he tied their hands and feet behind their backs with haystring. The black man came inside and began carrying guns out of the bedroom. The white man told them four or five times to tell the police that it was two black men or he'd come back and kill them. The white man then got a pitcher of tea from the refrigerator, while the black man continued to carry out guns. Then they left. Marty and B.B. cut through the haystring around their feet with their fingernails and found a knife from the kitchen to cut their hands loose. Looking out the window, they saw no one there, and saw that Ellis' truck was gone. They took Brandon, got in their car, and went to a friend's house, where Marty called the police. The Jasper County Sheriff's Office responded first; Marty told them that two black guys had tied them up. The Jasper County deputy sheriff determined that the incident occurred in Clarke County and called the Clarke County Sheriff's Department. He then took the girls with him to the mobile home and were met by Deputy Hopson. Marty again told Hopson that two black guys had tied them up. The girls were taken to their Uncle Marlin's house where Deputy Denham came to talk to them. When Marty found out that Ellis and Lamar were dead, she told Deputy Denham the truth  that a white man and a black man had tied them up. Upon taking Marty's and B.B.'s statements, Denham realized that the description of the two *81 men fit the description of two escapees from Clarke County Jail, Robert Minnick and James "Monkey" Dyess, who escaped from the jail the evening before.
Denham was also able to interview Thaddis Pryor, who was turkey hunting on the morning of April 26 around the Beaver Dam community in Clarke County where his deer camp is located. On Sunday morning, April 27, having heard about the incident at the Thomas mobile home, Pryor contacted the Clarke County Sheriff's Department and related that he saw a white man and a black man on an oil lease road on foot. He approached the two men because he thought they were poachers on his camp property. He described the white man as short, skinny, pale, with a shaved head and two rotten front teeth. The black man was around six feet tall, 190 pounds, muscular build, with a short Afro. He talked to the two men for about ten minutes. Denham then met with Pryor who took him to the area where he had met Minnick and Dyess while turkey hunting. Denham was able to observe a boot print and a tennis shoe print in the area. Pryor's descriptions matched the ones given by the girls, as well as the descriptions of the two jail escapees.
The investigation pinpointed three shotguns, three rifles, a pistol, and ammunition that were taken from the trailer by Minnick and Dyess, as well as Thomas' silver Ford pickup truck. Several days after the incident, Lafferty's wallet and Thomas' checkbook were found lying along the road several miles from the Thomas trailer. Furthermore, time of the incident was established as occurring after 1:00 p.m. on April 26. Lamar Lafferty's father ate lunch with his son and then saw Lamar and Lamar's son, Brandon, leave with Ellis in Ellis' truck around 1:00 p.m. Also, Greg Thomas, Ellis' cousin and closest neighbor, heard gunshots coming from Ellis' mobile home about 2:30 p.m. Thirty seconds later he heard another sound like a muffled shot or dud firecracker, and five minutes after that he heard two more shots which sounded like they came from a small-calibre gun. Shortly thereafter, he saw Marty and B.B. drive by in a red car.
The Medical Examiner's report indicated that Thomas suffered a close contact gunshot wound to the middle of the forehead and a second wound on the right lower back from a distance of approximately 15 feet. Lafferty suffered two gunshot wounds to the head, both close contact wounds from a small-calibre gun. The Medical Examiner's opinion was that both men were alive when their wounds were inflicted and died within a few minutes.
Denham entered the information concerning the missing guns and missing silver Ford pickup truck into the computer on the NCIC network. The truck was recovered in Florida on May 6, 1986. Apparently, the truck had been stolen from New Orleans by Paul Stanley Ward because when the truck was recovered, they found parking tickets from New Orleans under the seat. (Ward was convicted in Clarke County for possession of a stolen truck.) Denham then requested assistance from the New Orleans Police Department; however, they were not able to locate Minnick or Dyess.
On August 22, 1986, Denham received information from the San Diego Police that they had arrested Minnick. Denham flew out, arriving late August 24. He interviewed Minnick on August 25. He first advised Minnick of his rights, but Minnick refused to sign a waiver of rights form. Minnick agreed to tell him about his and Dyess' escape from Clarke County jail, but Minnick then proceeded to tell him about events after the escape. According to Minnick as told to Deputy Denham, he and Dyess walked outside of Quitman south toward DeSoto in a wooded area. They came upon a turkey hunter and talked to him early the next morning, then continued on until they came to a clearing where the Thomas mobile home was located. They decided to go into the trailer to find guns. As they were collecting the guns, a vehicle drove up with two men and a small child in it. Dyess jumped out of the mobile home and shot one of the men in the back with a shotgun, and then shot him in the head with a pistol. Dyess handed Minnick the pistol and told him to shoot the other man. *82 Dyess held a shotgun on Minnick until he did so. They then put the child on the sofa in the mobile home, after which the two girls drove up. They tied the girls up in the mobile home. Minnick stated that he talked Dyess out of raping or hurting the girls. Dyess dragged the bodies of the two men into the gully. They left with $121 in cash, the guns, and the silver pickup truck. They drove to New Orleans where they sold the weapons and threw the pistol in the trash. They left New Orleans on a bus to Brownsville, Texas, and then crossed the border into Mexico. Minnick and Dyess got into a fight  Dyess beat him and tried to kill him  so Minnick hitchhiked to California where he changed his name, procuring a birth certificate and a drivers license in the name of David Prokaska.
Minnick waived extradition and Denham brought him back to Mississippi to stand trial. Before trial commenced, the state was able to recover two of the guns stolen from the Thomas mobile home through the FBI in New Orleans.

LEGAL DISCUSSION

I. GUILT PHASE

A. Minnick's Alleged Statement to Denham Should Have Been Suppressed.
At pretrial hearing on motions, Minnick presented a written motion to suppress the statement allegedly given by him to Deputy Denham in San Diego, California, on August 25, 1986. That motion asserted that the statements were not voluntary and that Minnick made no knowing and intelligent waiver of his right to counsel, and that he had requested assistance of counsel.
At the hearing on the motion to suppress, both Denham and Minnick testified. Also, Minnick introduced a report of an interview of Minnick by the FBI on August 23, 1986. The FBI report shows that Minnick was advised of his rights and that he refused to sign a waiver form. Minnick answered some questions, but then ceased to answer, saying, "Come back Monday when I have a lawyer." The FBI interviewers honored his request and ceased interrogation.
Deputy Denham testified that when he interviewed Minnick, he first read Minnick his Miranda rights, but Minnick refused to sign a waiver form. Denham then asked Minnick if he wanted to talk about what happened. Minnick replied, "It's been a long time since I've seen you." Then Denham asked Minnick to tell about his escape from Clarke County Jail. Minnick agreed to do that much, and then, according to Denham, just proceeded to confess to the murders. Denham left the interview and wrote up his notes concerning what Minnick said. Minnick refused to sign Denham's handwritten account of their interview. Minnick later waived extradition, and Denham brought him back to Mississippi.
Minnick also testified at the suppression hearing that he was arrested in Lemon Grove, California, by local police on August 22, beat up and carried to San Diego County Jail where he was put in a holding cell. He claimed he was not read his rights until the FBI interviewed him. He refused to talk with the FBI without an attorney.
After the FBI interview, but before Denham arrived to interview him, Minnick stated that he spoke to an attorney who told him not to speak to anyone else about any of the charges against him. When Denham arrived at the jail, the jailers told Minnick that he would have to go down and talk to Denham. Denham read him his rights again, and Minnick refused to sign the waiver form. Minnick agreed to tell him about the escape from Clarke County Jail, and that is all he agreed to tell him. However, when questioned further about what he told Denham about the robbery and killings, Minnick refused to testify further, invoking his Fifth Amendment right against self-incrimination.
Minnick's motion to suppress the statements was overruled by the trial judge, who found that Minnick had knowingly and intelligently waived his rights. Denham could testify as to the confession, but his written notes could not be introduced into evidence. Minnick renewed his motion to *83 suppress at trial, which was again overruled.
On appeal, Minnick argues that the confession was taken in violation of his Fifth and Sixth Amendment rights to counsel.

1. Fifth Amendment Right to Counsel

Minnick argues that, under Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), Denham's initiation of the interview on Monday, August 25, violated his Fifth Amendment right to counsel under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), since Minnick invoked his right to counsel under Miranda during the FBI interview on August 23.
In Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), the United States Supreme Court held:
When an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights [footnote omitted]. We further hold that an accused, such as Edwards, having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.
Id. at 484-85, 101 S.Ct. at 1884-85. While it is true that Minnick invoked his Fifth Amendment right to counsel, it is also true, by his own admission, that Minnick was provided an attorney who advised him not to speak to anyone else about any charges against him.[1] In this kind of situation, the Edwards bright-line rule as to initiation does not apply. The key phrase in Edwards which applies here is "until counsel has been made available to him." Id. at 485, 101 S.Ct. at 1885. Since counsel was made available to Minnick, his Fifth Amendment right to counsel was satisfied. Therefore, this aspect of Minnick's argument is without merit.

2. The Sixth Amendment Right to Counsel.

Minnick argues further that his Sixth Amendment right to counsel under Mississippi law had attached by the time of the Denham interview since warrants for his arrest had issued; the state does not dispute this. See, e.g., Livingston v. State, 519 So.2d 1218, 1221 (Miss. 1988). The state, however, argues that Minnick knowingly and intelligently waived his right to counsel when he gave the statements to Denham. In Cannaday v. State, 455 So.2d 713 (Miss. 1984), this Court stated:
However, the Sixth Amendment right to counsel has broader ramifications [than the right to counsel under Miranda]. The accused's right to counsel, once that right has attached, is a broad guarantee that the accused "need not stand alone against the state at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a *84 fair trial." United States v. Wade, 388 U.S. 218, 226, 87 S.Ct. 1926, 1932, 18 L.Ed.2d 1149 (1967).
Id. at 722. Cannaday went on to say, "once this right has attached in a criminal case interrogation may not commence without the express waiver by the defendant of the right to counsel," citing Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964). Id. See also Page v. State, 495 So.2d 436, 440 (Miss. 1986). The precise question before us, then, is whether or not Minnick expressly waived his Sixth Amendment right to counsel when he spoke with Denham.
The standard for determining whether or not a defendant has waived his Sixth Amendment right to counsel was set out in Brewer v. Williams, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). The proper standard to be applied in determining the question of waiver as a matter of constitutional law is "that it [is] incumbent upon the state to prove `an intentional relinquishment or abandonment of a known right or privilege.'" Id. at 404, 97 S.Ct. at 1242. The right to counsel "does not depend upon a request by the defendant" and "courts indulge in every reasonable presumption against waiver." Id. But the Brewer opinion makes clear that a defendant can, without notice to counsel, waive his Sixth Amendment right to counsel. Id. at 405, 97 S.Ct. at 1242.
Applying this standard to Minnick's situation, the record supports the trial judge's finding that Minnick knew he had the right to counsel as evidenced by the fact that he had previously invoked it. There is also evidence from the record  from Minnick's own testimony at the suppression hearing  that he spoke to an attorney before Denham interviewed him, and that the attorney told him not to talk to anyone.
Denham, by Minnick's own account, warned Minnick again that he need not speak to him in the absence of counsel. Minnick then testified, however, that he refused to sign a waiver of rights form, apparently believing that a waiver of rights form must be signed for any waiver to be valid. The U.S. Supreme Court has rejected this "per se rule" argument in North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979), when it stated:
An express written or oral statement of waiver of the right to remain silent or of the right to counsel is usually strong proof of the validity of that waiver, but is not inevitably either necessary or sufficient to establish waiver.
Id. at 373, 99 S.Ct. at 1757. The Butler opinion went on to point out that while courts must presume that a defendant did not waive his rights, "in at least some cases waiver can be clearly inferred from the actions and words of the person interrogated." Id.
Minnick, again by his own admission, did not tell Denham he wished to have a lawyer present before he spoke to Denham. Minnick replied to Denham's request to talk about what happened by saying, "It's been a long time since I've seen you," after which the two of them talked about various folks back in Mississippi. Denham then asked Minnick if he would at least talk about how he escaped from Clarke County Jail. By Minnick's own account, he agreed to speak with Denham about the escape  a conscious decision to talk about the escape in the absence of counsel.[2] From Minnick's own words and actions, Minnick clearly relinquished his known right to counsel and responded to Denham's request.
From that point on, the evidence indicates, from Denham's testimony, that Minnick continued, freely and voluntarily, to *85 talk about events after the jail escape. This evidence went virtually unrebutted because Minnick, when questioned about whether or not he voluntarily continued to talk about events after the jail escape, refused to testify further, invoking his Fifth Amendment right against self-incrimination.[3]
Under this factual scenario, it is evident that Minnick was aware of his rights, had been advised by an attorney prior to the conversation with Denham, was aware that he did not have to make any statements or answer any questions, and that he made a conscious decision to relinquish his Sixth Amendment right to counsel. The trial judge so found, and under our often-articulated scope of review, this Court will not disturb a trial judge's findings at a suppression hearing unless manifestly in error, or contrary to the overwhelming weight of the evidence. See Merrill v. State, 482 So.2d 1147, 1151 (Miss. 1986). Frost v. State, 483 So.2d 1345, 1350 (Miss. 1986); Wiley v. State, 465 So.2d 318, 320 (Miss. 1985); Neal v. State, 451 So.2d 743, 756 (Miss. 1984).
In so holding, we note that had Minnick at any point during his interview with Denham elected to have assistance of counsel before speaking further, the waiver would have immediately been dissolved. See Patterson v. Illinois, 487 U.S. 285, ___, 108 S.Ct. 2389, 2395, 101 L.Ed.2d 261, 272 (1988), n. 5. However, there is no evidence on the record that Minnick made any such request during Denham's interview. Therefore, we find no error in the lower court admitting the testimony as to Minnick's oral confession at trial. This assignment of error is without merit.

B. The Court Erred in Overruling Minnick's Motion to Prohibit "Death Qualification" of Jury Prior to Guilt Phase.
Minnick filed a motion to prohibit "death qualification" prior to the guilt phase, which was overruled at pre-trial hearing on motions. Minnick argues that the defendant is prejudiced by being required to voir dire the jury on their feelings about the death penalty because jurors who could not vote to impose the death penalty are excluded, resulting in an unfair cross section of the community. In Cole v. State, 525 So.2d 365, 374 (Miss. 1987), this Court rejected this argument, as has the United States Supreme Court in Lockhart v. McCree, 476 U.S. 162, 106 S.Ct. 1758, 90 L.Ed.2d 137 (1986). This assignment, therefore, is without error.

C. The Court Erred in Improperly Instructing the Jury as to Burden of Proof.
At the end of the first day of trial, the trial judge gave the jury instructions as to their sequestration  that they must stay together, not talk to anyone about the case, not watch tv, not read the newspapers, etc. He summed up by reminding the jury that their "decision must be based upon and *86 controlled by the greater believable evidence in this courtroom and nowhere else." Minnick complains that the judge stated the wrong burden of proof. The distinction, however, is that the judge was not formally instructing the jury on the law, but rather on their conduct while being sequestered. Minnick makes no showing that this isolated remark prejudiced the jury. He made no contemporaneous objection to the remark, and cites no authority for his proposition. Therefore, this Court need not consider this assignment of error. May v. State, 524 So.2d 957, 967 (Miss. 1988); Ramseur v. State, 368 So.2d 842 (Miss. 1979).

D. The Court Erred in Allowing Testimony of Marlon Lafferty.
The state offered the testimony of Marlon Lafferty, Lamar's father. The first time the state advised Minnick that it planned to use Lafferty as a witness was the first day of trial, the day before Lafferty was offered as a witness, in violation of Rule 4.06, Unif.Crim.R.Cir.C.Prac. Minnick cites Box v. State, 437 So.2d 19 (Miss. 1983), for the proposition that Lafferty's testimony should have been excluded. The guidelines set out in the concurrence in Box (Robertson, J.), 437 So.2d at 22, have been applied by this Court in subsequent cases. See, e.g., Shaw v. State, 521 So.2d 1278 (Miss. 1987); Cole v. State, 525 So.2d 365, 367 (Miss. 1987); Griffin v. State, 504 So.2d 186, 195 (Miss. 1987). Under the Box procedure, defense counsel must first make timely objection, to which the trial court should respond by giving defense counsel a reasonable opportunity to interview the witness. Box, 437 So.2d at 23. In the instant case, Minnick's counsel objected and the trial court allowed him a recess to interview Lafferty. If after the interview the defendant thinks he has been subjected to unfair surprise and that he will be prejudiced by the evidence, the defendant must move for a continuance. Id. Minnick's counsel did not move for a continuance, but merely renewed his objection, which the trial court overruled. Since the defendant did not move for a continuance, the trial court did not err in admitting the evidence. Furthermore, Minnick was not prejudiced by the testimony. Lafferty's testimony was brief and concise on one issue  establishing that his son and Thomas were killed sometime after 1:00 p.m., since he had seen them both at lunchtime. Therefore, this assignment of error is without merit.

E. The Court Erred in Failing to Sustain the Defense Challenge for Cause for Juror No. 28.
Minnick contends that Juror No. 28, Kenny Vickery, should have been stricken for cause because Vickery stated during voir dire that in order for him not to impose the death penalty, Minnick would have to prove beyond a reasonable doubt that he should not be executed. The court overruled the challenge for cause as to Vickery; defense counsel then used his twelfth peremptory challenge to remove Vickery. However, defense counsel made no more challenges for cause and requested no more peremptory challenges.
This Court has held that "the general rule is that failure to excuse for cause is error when appellant has exhausted his peremptory challenges." Billiot v. State, 454 So.2d 445, 457 (Miss. 1984). See also Johnson v. State, 512 So.2d 1246, 1255 (Miss. 1987); Gilliard v. State, 428 So.2d 576, 580 (Miss. 1983); Rush v. State, 278 So.2d 456, 458 (Miss. 1973); Chapman v. Carlson, 240 So.2d 263, 268 (Miss. 1970). Billiot went on to say, "Appellant did not thereafter ask for any more challenges either for cause or peremptory. Therefore, there was no reversible error." Billiot, 454 So.2d at 457. Since defense counsel had not exhausted his peremptory challenges and did not challenge anyone else for cause, or ask for more peremptory challenges, this assignment of error is without merit.

F. The Court Erred in Admitting Photos of the Dead Bodies.
Before trial, Minnick made a motion to prohibit the introduction of photos of the dead bodies on the grounds of irrelevancy and prejudice. The lower court reserved ruling until trial, at which time the motion *87 was overruled. The state argued at pre-trial hearing that it wished to use the photos to establish corpus delicti.
This Court recently, in Boyd v. State, 523 So.2d 1037 (Miss. 1988), stated, "If photographs are relevant, the mere fact that they are unpleasant or gruesome is no bar to their admission into evidence." Id. at 1040. Furthermore, Boyd went on to state that the admission of photographs is within the sound discretion of the trial judge and his decision will be upheld by this Court unless there is an abuse of discretion. Id. Under M.R.E. 403, the trial judge may exclude relevant evidence if its probative value is outweighed by its prejudicial effect. The photos admitted in the instant case were not particularly gruesome, though they were realistic; they were few in number; they tended to corroborate the investigative officers' testimony about where and how the bodies were found. They also tended to illustrate the medical examiner's testimony as to cause of death. The trial judge did not abuse his discretion in allowing the photographs into evidence. See, e.g., Williams v. State, 544 So.2d 782 (Miss. 1987); Alford v. State, 508 So.2d 1039, 1041 (Miss. 1987); Johnson v. State, 476 So.2d 1195, 1206 (Miss. 1985). Therefore, this assignment of error is without merit.

G. The Court Erred in Not Granting a Continuance Based on the Untimely Disclosure of the Blymier Evidence by the State.
Ten days before trial, the state informed Minnick's counsel that they had uncovered a material witness, James Blymier, who would testify that he bought two guns from Dyess and Minnick in New Orleans in May of 1986 (the guns were identified by serial number as two of the guns taken from the Thomas mobile home), and would identify Minnick in court. Blymier would also testify that he previously knew Dyess as one of his employees. The state became aware of this witness only the day before it notified defense counsel. Minnick filed a motion for continuance in order that defense counsel could interview Blymier. The trial judge denied the motion for continuance, but did state that as soon as Blymier was available in Mississippi, the state was to allow defense counsel an opportunity to interview him. Blymier showed up the day he was to testify, and the lower court gave defense counsel a recess during trial to interview Blymier. After the interview, Minnick made a motion to suppress the Blymier testimony, at which time Blymier testified out of the presence of the jury. Minnick again moved for a continuance. The trial judge overruled both motions, allowing Blymier to testify.
The state does not dispute that Minnick's motion for continuance was properly brought before the trial court, as set out in Gates v. State, 484 So.2d 1002, 1006 (Miss. 1986), and Miss. Code Ann. § 99-15-29 (1972). Minnick alleges that the trial court abused its discretion by not allowing a continuance in order for him to interview Blymier. The granting or denial of a continuance is within the sound discretion of the trial judge. Gates, 484 So.2d at 1006; King v. State, 251 Miss. 161, 168 So.2d 637, 641 (1964). The Gates opinion speaks to the issue of a continuance when a witness is unavailable. The present case is distinguishable in that Blymier was made available, albeit in New Orleans, to Minnick's counsel ten days before trial. Minnick's counsel was given as much time as he wanted to interview Blymier before Blymier testified. The need for a continuance under these circumstances is spurious, and Minnick has not shown how he was prejudiced by not having more time than ten days to find and interview Blymier. He made no such showing in his motion for new trial, which Gates, 484 So.2d at 1006, states must be shown. See also Denton v. State, 348 So.2d 1031, 1033 (Miss. 1977) (again, dealing specifically with an unavailable witness). This Court has upheld a denial of a continuance where defense counsel has been given an opportunity to interview the witness before trial. Speagle v. State, 390 So.2d 990, 991 (Miss. 1980). Therefore, this assignment of error is without merit.

*88 H. The Court Erred in Refusing to Exclude the Blymier Evidence.
Minnick continues his allegation that, because the state did not disclose Blymier as a witness during original discovery, his testimony should have been excluded. The state does not dispute that there was a discovery order entered pursuant to Unif.Crim.R.Cir.Ct.Prac. 4.06. See Morris v. State, 436 So.2d 1381, 1387 (Miss. 1983). The question then becomes whether or not the state violated Rule 4.06. As pointed out above, Minnick was aware of Blymier's potential testimony ten days prior to trial; Minnick received notice from the state about Blymier the day after the state uncovered him as a witness. Under these circumstances, it is hard to say that the state violated Rule 4.06. Furthermore, even if the situation could be characterized as one in which the state "failed" to produce discovery, "failure to make pretrial disclosure [does not] require per se reversal. We have recognized that non-discovered evidence may be admitted at trial if the party against whom that evidence is offered is given a reasonable opportunity to make adequate accommodation." Henry v. State, 484 So.2d 1012, 1014 (Miss. 1986). See also Foster v. State, 484 So.2d 1009 (Miss. 1986); Jones v. State, 481 So.2d 798 (Miss. 1985); Davis v. State, 472 So.2d 428 (Miss. 1985); Cabello v. State, 471 So.2d 332 (Miss. 1985). Minnick had ten days to deal with Blymier's potential testimony. When Blymier appeared to testify, the trial judge called a recess and gave defense counsel as much time as he wanted to interview the witness. Therefore, the trial court did not abuse its discretion by allowing Blymier to testify. This assignment of error is without merit.

I. The Court Erred in Excluding the FBI-Stockwell Report.
Blymier testified that he bought the guns from Minnick and Dyess and turned them over to his store manager, Stockwell, for Stockwell to turn over to the FBI. FBI Special Agent Bryan Shields testified that he received the guns from Stockwell. Shields also stated that he made a memorandum of his interview with Stockwell which Minnick offered into evidence to impeach Blymier's testimony; the state objected on hearsay grounds. Minnick then argued that the report falls into the catchall exception, M.R.E. 804(b)(5), because Stockwell was not available to testify, even though a subpoena had been issued for him, and because the report had guaranties of trustworthiness since Stockwell made his statements to the FBI. The trial judge did not allow the report into evidence on the grounds that it was hearsay.
Stockwell's statement to the FBI as to how he came into possession of the guns did not tally with Blymier's testimony that he, Blymier, had bought the guns from Dyess and Minnick and turned them over to Stockwell. Stockwell's statement to the FBI indicates that he took the guns away from a man named Vincent Mendez, whom he saw take the guns from a black man in an alley behind Blymier's grocery store. Stockwell indicated that he brought them to the FBI when he learned that the guns had been implicated in a murder in New Orleans. Stockwell was shown a photo display of black men, including a picture of Monkey Dyess, to determine if he could positively identify the man who handed the guns to Mendez. Stockwell could not positively identify anyone.
The problem with the FBI report is that it is hearsay within hearsay. The report itself could probably be admitted under M.R.E. 803(6), Records of a Regularly Conducted Activity. The comments to Rule 803(6) indicate that law enforcement reports can be considered under this exception. However, Stockwell's statements are not excepted by 803(6), as the comment indicates:
However, the source of the material must be an informant with knowledge who is acting within the course of the regularly conducted activity. This is exemplified by the leading case of Johnson v. Lutz, 253 N.Y. 124, 170 N.E. 517 (1930), which is still the applicable law today under the rule. That case held that a police report which contained information obtained from a bystander was inadmissible; the officer qualified as one *89 acting in the regular course of a business, but the informant did not.
Stockwell's statements do not fit any 803 or 804 exception. The question becomes, then, whether the requirements of 804(b)(5) were met. The trial judge, while not making specific findings as to the admissibility of the evidence under a residual exception, found the Stockwell statements to be hearsay which did not fit any exception.
In Cummins v. State, 515 So.2d 869 (Miss. 1987), this Court analyzed the requirements of the residual exceptions at length. Rule 804(b)(5) requires that the proponent of the hearsay statement must give notice to the party against whom the evidence is offered. Minnick candidly admits that no notice was given until the day of trial, but that Stockwell's statements came from the state's files in the first place, so that the state could not have been totally surprised by their being offered into evidence. As Cummins points out, "[g]reat latitude is usually allowed depending on the facts and circumstances of each case in the context in which the evidence arises." Cummins, 515 So.2d at 873. The overriding concern, before a hearsay statement may be admitted under a residual exception, is that it has equivalent guarantees of trustworthiness similar to those of other exceptions. Minnick argues that because the statements are contained in an FBI report, they are trustworthy. The argument, however, goes to the report itself, and not to Stockwell's statements. Minnick did not offer at trial, nor here on appeal, any evidence that Stockwell's statements themselves were especially trustworthy. Considering the circumstances surrounding the retrieval of the guns, there is no outstanding reason to consider Stockwell's statements particularly trustworthy, as apparently the trial judge did not find them to be. As Cummins pointed out, "in the absence of a finding that the hearsay statements offered were sufficiently reliable, it [would be] error to admit them pursuant to the residual exceptions to the hearsay rule. Cummins, 515 So.2d at 874.
The residual exception also requires that the statement be offered as evidence of a material fact. It can be argued that it was material to Minnick's alibi defense as to whether or not he could be tied in with the guns in New Orleans; however, the next requirement, that the statement is more probative on the point for which it is offered than any other evidence the proponent can procure through reasonable effort, weighs against admission. Minnick could have offered alibi evidence through other witnesses as to his whereabouts when these guns came into Stockwell's or Blymier's possession, and could have achieved the same result as Stockwell's statements could have achieved. Minnick made no attempt at trial to offer any such evidence. As Cummins states, "this requirement raised an issue of fact as to whether or not [the proponent] used reasonable efforts to procure live testimony... . Absent such a finding the evidence cannot be admitted under the residual exception to the hearsay rule." Cummins, 515 So.2d at 874.
Minnick did not successfully demonstrate at trial that Stockwell's statements met the requirements of 804(b)(5), and the trial judge correctly excluded the statements from evidence. Minnick makes no better argument here on appeal. Therefore, this assignment of error is without merit.

J. The Court Erred in Admitting the Guns.
The two guns obtained through the FBI from Blymier/Stockwell, were admitted into evidence through the testimony of FBI agent Linda Lee, who had custody of the guns before trial. The guns had previously been identified as those belonging to Donald Ellis Thomas through serial number checks. Minnick objected to their being admitted on the grounds that chain of custody of the evidence had been broken because Stockwell was not available to testify. However, FBI Agent Bryan Shields did testify that he received the guns from Stockwell. From the time the FBI received the guns until they were admitted at trial, the chain of custody was established. In Gibson v. State, 503 So.2d 230, 234 (Miss. 1987), this Court reiterated that the test for continuous possession of evidence is whether *90 or not there is any indication of probable tampering with or substitution of evidence. "Any question as to the chain of possession is within the sound discretion of the trial judge, and, absent abuse resulting in prejudice to the defendant, his decision will stand on appeal." Id. There is no indication that the evidence was tampered with in the present case; indeed, there is no allegation by Minnick to that effect. Furthermore, in Evans v. State, 499 So.2d 781, 783 (Miss. 1986), this Court stated:
Physical objects which are relevant and for which the chain of custody is not broken or which are otherwise identified with certainty are admissible into evidence. [cites omitted] Matters regarding the chain of custody of evidence are largely within the discretion of the trial court, and absent an abuse of discretion, this Court will not reverse. [cites omitted] However, the confrontation clause of the Sixth Amendment is restricted to witnesses, and does not include physical evidence. United States v. Herndon, 536 F.2d 1027, 1029 (5th Cir.1976); G.E.G. v. State, 389 So.2d 325, 326 (Fla. Dist. Ct. App. 1980); State v. Armstrong, 363 So.2d 38, 39 (Fla. Dist. Ct. App. 1978).
The chain of custody was not broken; the guns had been otherwise identified with certainty; no confrontation clause considerations arise. Therefore, the trial court correctly admitted the guns into evidence. This assignment of error is without merit.

K. The Court Erred in Mentioning that Defense Counsel was Appointed.
At the very beginning of the trial, the trial judge introduced Minnick's attorneys by saying:
And, the defendant is represented by Mr. Gates from Meridian. He's associated and I have appointed an attorney from Columbus, but I'm sorry, I can't recall your name.
Minnick cites Sanders v. State, 429 So.2d 245, 252 (Miss. 1983), wherein this Court, in unequivocal terms, condemned the practice of defense counsel introducing themselves as court-appointed attorneys. However, in Compton v. State, 460 So.2d 847 (Miss. 1984), this Court, while reiterating the point that neither judges nor attorneys should introduce counsel as court-appointed, held that such a remark did not constitute reversible error in that case. Id. at 848. The remark, though not particularly commendable, does not amount to reversible error in this case. This assignment of error is without merit.

L. The Court Erred in Not Suppressing In-Court Identification by Blymier, Thomas, Beech and Pryor.
Minnick makes the argument that the pre-trial identification procedures were suggestive and that the in-court identifications were not sufficiently reliable. The "Wade trilogy" and its progeny are the guidelines this Court must follow in determining the competency of identification testimony. York v. State, 413 So.2d 1372, 1374 (Miss. 1982). York is the leading case in Mississippi on this issue and has been followed by this Court on numerous occasions. See, e.g., Davis v. State, 510 So.2d 794 (Miss. 1987); White v. State, 507 So.2d 98 (Miss. 1987); Jones v. State, 504 So.2d 1196 (Miss. 1987); Smith v. State, 492 So.2d 260 (Miss. 1986). As pointed out in York, there are two lines of analysis when considering pre-trial identifications: the Fourteenth Amendment due process analysis and the Sixth Amendment right to counsel analysis. Minnick raises only the issue that the pre-trial identification photographic displays were suggestive. He does not specify, however, how any of the photographs were suggestive.
At the pre-trial hearing on Minnick's motion to suppress any identification from the photographs or any in-court identification, the evidence showed that Marty Thomas and Desiree Beech, who were tied up in Donald Ellis Thomas' mobile home, picked out Minnick and Dyess from a photo lineup after they had given a description of their assailant  pale, short, skinny, with a shaved head  to the deputy sheriff. Both testified that they could easily identify Minnick in court from their own independent knowledge of what the man who tied them up looked like, and there was no suggestion that anyone had told them who to pick from this lineup. Both girls identified photographs *91 of Minnick at trial as well as identifying him in court.
Since there is no allegation that the photo display shown to the girls was suggestive, the trial court did not err in allowing either the evidence of their out-of-court identification of Minnick or their in-court identification of him. As stated in York, 413 So.2d at 1383, "[o]nly pretrial identifications which are suggestive, without necessity for conducting them in such manner, are proscribed."
Thaddis Pryor, who was turkey hunting and stopped and talked to a white man and a black man walking down a road in rural Clarke County on the morning of the murder, gave a description of these two men to the deputy sheriff on the day after the incident. Pryor was not shown any pictures at that time. At trial, Pryor identified photographs of Minnick and Dyess as the same two men he talked to on the morning of April 26. He also identified Minnick in court. Since Pryor did not participate in any pre-trial identification procedures, his in-court identification could not have been tainted by any suggestive pretrial procedures, and the trial court did not err in allowing him to testify as to Minnick's identity.
As to Blymier's identification of Minnick, there is a question of suggestiveness, since it seems from the record that the district attorney simply took a photograph of Minnick to New Orleans with him and showed it to Blymier. See Manson v. Brathwaite, 432 U.S. 98, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977). However, there is only fleeting reference to this procedure in the record, and defense counsel did not develop it on the record or here on appeal. The trial judge heard Blymier's testimony out of the presence of the jury in a short suppression hearing during trial, and found that there would be no substantial likelihood of irreparable misidentification in allowing him to identify Minnick in court, since Blymier was able to describe Minnick accurately from seeing him in New Orleans. We cannot say that the trial judge was in error. Even an impermissibly suggestive pre-trial identification does not preclude in-court identification by an eyewitness who viewed the suspect at the procedure "unless: 1) from the totality of the circumstances surrounding it, 2) the identification was so impermissibly suggestive as to give rise to a very substantial likelihood of a misidentification." York at 1383, citing Stovall v. Denno, 388 U.S. 293, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967), and Simmons v. U.S., 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968). York, citing Neil v. Biggers, 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972), goes on to set out the factors to consider in determining whether this standard has been met:
1. Opportunity of the witness to view the accused at the time of the crime;
2. The degree of attention exhibited by the witness;
3. The accuracy of the witness's prior description of the criminal;
4. The level of certainty exhibited by the witness at the confrontation;
5. The length of time between the crime and the confrontation.
York, 413 So.2d at 1383; Neil, 409 U.S. at 199, 93 S.Ct. at 382. See also Ray v. State, 503 So.2d 222, 223 (Miss. 1987). Applying these factors to Blymier's identification of Minnick in court, Blymier stated that he was able to identify Minnick in court, not because of the photograph he had seen earlier, but because he had seen Minnick in the alley by his store when Minnick and Dyess sold him the guns. He described Minnick as short, skinny, pale, and with a shaved head, a description which fit Minnick at the time he would have been in New Orleans with the guns. While there was very little testimony developed about Blymier's level of certainty of identification when he first saw the picture of Minnick and none as to the length of time between the sale of the guns to Blymier and his identifying Minnick's photograph, there was also nothing to contradict the accuracy of Blymier's identification. Under the totality of the circumstances, we cannot say that there was a very substantial likelihood of misidentification. Therefore, this assignment of error is without merit.

*92 M. The Court Erred in Excluding Certain Testimony Pertaining to Paul Stanley Ward.
The defense called as a witness Polly Covington, the attorney for Paul Stanley Ward. She testified that Ward pled guilty and was convicted in Clarke County, Mississippi, of possession of Donald Ellis Thomas' stolen truck. Ward was found in Florida with the truck. Defense counsel then asked Mrs. Covington what conversations she had with Ward concerning how he came into possession of Thomas' truck. The state objected to Mrs. Covington being allowed to answer the question because her answer would be hearsay. The trial court sustained the objection. Proffer of the testimony was made, as follows:
Q: What, if any, conversation did you have with Paul Stanley Ward concerning whether he stole the truck of Donald Ellis Thomas?
A: I would assert the attorney/client privilege pursuant to Count IV of the Code's professional responsibility and will follow the Rules of Evidence as to anything except what is in the public record or I have access to in the public record.
Q: What, if any, conversations did you have with Paul Stanley Ward concerning whether or not he had any involvement in the death of Lamar Lafferty and Donald Ellis Thomas?
A: There again, I would assert the attorney/client privilege to any conversations I had with him. That would not be evidence from the public record.
The proffer also showed that Ward waived indictment and pled guilty to grand larceny, stating he had stolen the truck from the streets of New Orleans and had driven it to Florida.
Minnick argues that he should have been allowed to get this testimony before the jury even though Mrs. Covington asserted the attorney/client privilege. He analogizes this situation to that of Stewart v. State, 355 So.2d 94 (Miss. 1978), where this Court discussed the right of a defendant to call a witness who, it was obvious from the other evidence, would refuse to answer questions based on his Fifth Amendment right against self-incrimination. This Court held it was reversible error for the trial court to exclude that witness in that case because the witness could have answered some questions to which the Fifth Amendment privilege did not apply. This Court recognized, however, that there was a split of authority on the issue.
In United States v. Roberts, 503 F.2d 598 (9th Cir.1975), speaking of a witness who asserted his Fifth Amendment right not to incriminate himself, the Ninth Circuit stated:
The Sixth Amendment right to call a witness must be considered in the light of its purpose, namely to produce testimony for the defendant. [cite omitted] Calling a witness who will refuse to testify does not fulfill the purpose... .
Id. at 600. See also United States v. Martin, 526 F.2d 485, 487 (10th Cir.1975); United States v. Johnson, 488 F.2d 1206, 1211 (1st Cir.1973).
Assuming the attorney/client privilege is analogous to the Fifth Amendment privilege against self-incrimination, the trial court did not reversibly err by not allowing Mrs. Covington to get on the stand and assert the attorney/client privilege. Nothing could be gained by the defendant having her so testify. The attorney/client privilege aside, anything Ward would have said to her about how he came into possession of the truck would have been hearsay, anyway. For these two reasons, then, this assignment of error is without merit.

N. The Prosecutor Made Improper Closing Argument.
Minnick asserts that in closing argument at guilt phase, the state's attorney appealed to the jury's emotions with an argument calculated to inflame them. Specifically, he objects to:
(1) The state's attorney arguing that the two deceased victims "testified" through the state medical examiner.
*93 This argument was objected to by defense counsel and overruled.
(2) The state's argument that the jury should do justice for the people of Clarke County.
No objection was made at trial to this line of argument.
(3) The prosecution's rebuttal argument stated he was mad that defense counsel had the audacity to suggest the possibility that the eyewitness testimony of the two little girls could be unreliable.
No objection was made to this argument at trial.
(4) The DA's characterization of Minnick's confession statement that Dyess forced him to shoot one of the victims as an excuse, and that Minnick was the only one identified with the pistol.
This argument was objected to at trial, which the trial court sustained to some extent by telling the jury that it was to find facts from the evidence, and not based on what counsel says. The DA continued this line of argument, to which defense counsel again objected; the objection was sustained.
(5) The DA, in rebuttal, argued that the people are the law and the people must enforce the law.
Defense counsel objected, which objection was sustained; defense counsel then moved for mistrial, which was denied.
The state first argues that as to those statements made by the prosecutor to which no contemporaneous objection was made the error, if any, is waived, citing Cole v. State, 525 So.2d 365 (Miss. 1987), wherein this Court stated: "If no contemporaneous objection is made, the error, if any, is waived. This rule's applicability is not diminished in a capital case." Id. at 369. See cases cited therein. This procedural bar would apply to allegations (2) and (3) above. The state argues that the other comments must be taken as a whole, and as such, they fall into the wide latitude permitted in final argument, citing Griffin v. State, 504 So.2d 186 (Miss. 1987). In Griffin this Court stated: "Both sides are afforded wide latitude in their final arguments to the jury so long as they do not argue some impermissible factor." Id. at 194. See also Neal v. State, 451 So.2d 743, 762 (Miss. 1984). Two of the prosecutor's statements which could be characterized as impermissible, that Minnick was the only one identified with the pistol, which the evidence did not concretely support, and that the people are the law and the people must enforce the law, were objected to and the objections sustained by the trial court. The trial court additionally instructed the jury that it must find the facts, and not rely on what the prosecutor says the facts are. These two objectionable statements were cured by the trial judge.
Taken as a whole, all of these statements fall into the permissible latitude afforded attorneys in closing argument. As this Court stated in Johnson v. State, 416 So.2d 383, 391 (Miss. 1982), quoting Nelms and Blum Company v. Fink, 159 Miss. 372, 382, 131 So. 817, 820 (1930):
Counsel was not required to be logical in argument; he is not required to draw sound conclusions, or to have a perfect argument measured by logical and rhetorical rules; his function is to draw conclusions and inferences from evidence on behalf of his client in whatever he deems proper, so long as he does not become abusive and go outside the confines of the record.
Minnick was not impermissibly prejudiced by the prosecutor's remarks and, therefore, this assignment of error is without merit.

II. PENALTY PHASE

A. The Court Erred in Overruling Minnick's Motion for Supplemental Voir Dire of the Jury at the Penalty Phase.
Pre-trial, Minnick filed a motion for separate voir dire of the jury at penalty phase, which was overruled. This motion was filed in conjunction with his motion that the jurors should not be "death qualified" as discussed. On appeal, Minnick actually argues that a separate jury should have been empaneled to hear the evidence at penalty phase.
*94 This argument has been rejected by this Court on numerous occasions. See, e.g., Johnson v. State, 476 So.2d 1195, 1202 (Miss. 1985); Jones v. State, 461 So.2d 686, 692 (Miss. 1984); Billiot v. State, 454 So.2d 445, 455 (Miss. 1984); Culberson v. State, 379 So.2d 499, 508 (Miss. 1980); Jackson v. State, 337 So.2d 1242, 1256 (Miss. 1976). In Jackson this Court indicated that the preferred practice was to keep the same jury for both phases of the trial if practical and barring any unforeseen circumstances. Jackson, 337 So.2d at 1256. In Johnson and Billiot, this Court pointed out that such practice was provided for in Miss. Code Ann. § 99-19-101 (Cumm.Supp. 1987) and that such practice is constitutional. Billiot, 454 So.2d at 456; Johnson, 476 So.2d at 1202. Therefore, this assignment of error is without merit.

B. The Court Erred in Excluding the FBI-Stockwell Report at Sentencing Phase.
This assignment of error as to guilt phase was discussed above. Minnick puts forth no new arguments as to the exclusion of the report at penalty phase. Therefore, the previous discussion applies here, as well. This assignment of error is without merit.

C. The Court Erred in Failing to Grant a Cautionary Instruction as Requested by Defense Counsel.
At the end of the guilt phase, defense counsel asked for a cautionary instruction to the effect that on three occasions there were serious emotional outbursts by members of the victims' families. Minnick wanted the jury instructed to discount any emotional outbursts during deliberation. The instruction was denied. This argument is tied to Minnick's earlier argument that a new jury should have been empaneled before sentencing phase because during guilt phase, several members of the victims' families testified. Minnick characterizes the testimony and the emotional outbursts as tantamount to victim impact evidence which was prohibited in Booth v. Maryland, 482 U.S. 496, 107 S.Ct. 2529, 96 L.Ed.2d 440 (1987). Alternatively, he argues that under Fuselier v. State, 468 So.2d 45 (Miss. 1985), the emotional outbursts prejudiced Minnick to the point that the jury returned the death penalty based on emotion and sympathy for the victims' families, amounting to an arbitrary imposition of the death penalty.
It is true that several members of the victims' families testified; however, they all testified as to facts relevant and pertinent to the issues in the case. None of these witnesses testified about any emotional impact the death of their loved ones had on them.
Clearly, Booth does not apply to this kind of testimony. The Booth decision dealt with a Maryland statutory provision that a prepared Victim Impact Statement (VIS) outlining the emotional impact on the family and outlining the family's characterization of the crime, should be introduced into evidence at penalty phase. Such evidence was held by the Booth court to violate the Eighth Amendment. Absolutely nothing of the kind of evidence prohibited by Booth was before the jury in the present case.
As to the analysis under Fuselier, there was no situation in the present case as there was in Fuselier, where a member of the victim's family sat with the prosecutor inside the rail, facing the jury, consulting with the prosecutor, and displaying emotion. There is no specific indication in the present record when these alleged emotional outbursts occurred, or that they at any point interrupted the proceedings.
Based on the record, there was no emotionalism displayed that rises to the level as discussed in Fuselier. The trial judge apparently did not believe there was a serious problem, and from the record there is no basis to say that he was in error by denying the request for a cautionary instruction. Furthermore, the jury was adequately instructed on numerous occasions that it must determine sentence based only on the law and the evidence. This assignment of error is without merit.

D. The Court Erred in Refusing Instruction D-3  Sentencing Phase.
Minnick requested the following jury instruction, which was refused:

*95 The Court instructs the jury that if you have any whimsical doubt then that is a mitigating circumstance.
In refusing the instruction, the trial court told defense counsel that he could argue whimsical or residual doubt to the jury if he chose, which defense counsel did. Minnick cites Smith v. Wainwright, 741 F.2d 1248 (11th Cir.1984), as support for his proposition. While that case acknowledges that a "whimsical doubt" might inure to the benefit of a defendant, the opinion does not say that the jury needs to be instructed on whimsical doubt as a mitigating factor. In fact, this discussion was in the context of the court considering an ineffective assistance of counsel claim and, tangentially, the ramifications of a single jury sitting for both phases of a capital trial. In a later Fifth Circuit case, Johnson v. Thigpen, 806 F.2d 1243 (5th Cir.1986), the Fifth Circuit again considered whimsical doubt in terms of such being a beneficial by-product of the same jury sitting for both phases of the trial. Id. at 1251. That discussion was in the context of what limitations may be imposed on defense counsel's argument so as not to impair the jury's consideration of residual doubt. No discussion of a jury instruction appears in this opinion.
In the recent case of Franklin v. Lynaugh, 487 U.S. 164, 108 S.Ct. 2320, 101 L.Ed.2d 155 (1988), the United States Supreme Court addressed the issue of whether or not the Eighth Amendment requires that the jury be instructed as to residual doubt as a mitigating factor. In a plurality opinion (the two concurring justices did not disagree on this issue, but voiced some concern over Texas's sentencing procedure), the Supreme Court pointed out that none of its previous opinions held that there is a constitutional right to such an instruction in mitigation, pointing out that residual doubt does not go to the issue of defendant's character, record, or circumstances of the offense, but only to doubt about defendant's guilt which is not, in the strictest sense, a mitigating factor. Franklin, 487 U.S. at ___, 108 S.Ct. at 2327, 101 L.Ed.2d at 166. The opinion focuses on the idea that where a defendant argues residual doubt to the jury, which a defendant is free to do to a relevant extent, the defendant's right to have a jury consider residual doubt is not impaired by the trial court rejecting an instruction on residual doubt. Franklin, 487 U.S. at ___, 108 S.Ct. at 2328, 101 L.Ed.2d at 167.
Since Minnick's counsel was able to argue whimsical doubt to the jury, the jury's consideration of whimsical doubt was not impaired by the trial court's denial of a jury instruction on whimsical doubt. Therefore, this assignment of error is without merit.

E. The Court Erred in Excluding the Prison Record of Paul Stanley Ward at Sentencing Phase.
Defense counsel offered the prison record of Ward at sentencing phase because the records reflect that Ward escaped from the custody of the Mississippi Department of Corrections on November 7, 1986. Apparently, Minnick's argument is that Ward's flight from custody is a fact from which guilt can be inferred, citing Fuselier v. State, 468 So.2d 45, 57 (Miss. 1985). It is not clear from either the record or from appellant's brief what crime Ward was supposedly fleeing when he escaped from prison. In this regard, Minnick's reliance on Fuselier is totally misplaced; the flight instruction in Fuselier was held to be improperly given because flight from the murder scene could have been probative of guilt of two to crimes  murder and escaping from prison. Id. at 57.
The trial court correctly excluded Ward's prison records on the basis that they were totally irrelevant to any mitigating factor. Nevertheless, Minnick further argues that the Ward prison records could have gone to whimsical doubt. Again, as discussed above, the trial judge can exclude, as irrelevant, mitigation evidence not bearing on defendant's character, record or circumstances of the crime. Therefore, this assignment of error is without merit.

F. The Court Erred in Excluding Evidence Pertaining to James Dyess at Penalty Phase.
As with the Ward prison record, Minnick also offered in mitigation the prison *96 record of James "Monkey" Dyess to show that Minnick was under the domination of Dyess. The trial judge found the prison records to be irrelevant and not germane to the issue of Dyess' domination of Minnick. While it is true that the defendant has a right to place before the jury any mitigating evidence as to the circumstances of the crime, as well as his character, see, e.g., McCleskey v. Kemp, 481 U.S. 279, ___, 107 S.Ct. 1756, 1773, 95 L.Ed.2d 262, 286 (1987), Skipper v. South Carolina, 476 U.S. 1, 8, 106 S.Ct. 1669, 1673, 90 L.Ed.2d 1 (1986), Cole v. State, 525 So.2d 365, 371 (Miss. 1987), it is clear that the evidence must be relevant to one or more of those factors. While evidence that Minnick's character was such that he could be easily dominated by a stronger personality might be relevant, or evidence that in the circumstances of this offense Minnick was dominated by someone else, there is no indication or reason to believe that the prison records of James Dyess would demonstrate either of those factors. Furthermore, the focus of mitigation evidence is that of the defendant's character, record, etc., so that individualized consideration of sentencing may be engaged in by the jury. See McCleskey, 481 U.S. at ___, 107 S.Ct. at 1773, 95 L.Ed.2d at 262. Dyess' prison records do nothing to focus on Minnick's character or the circumstances of this crime. Therefore, the trial judge correctly excluded the Dyess prison records from evidence at sentencing phase. This assignment of error is without merit.

G. The Court Erred in Admitting Records of Conviction.
Minnick's records of prior convictions from both California and Mississippi were introduced at penalty phase over objection by defense counsel on the basis of lack of foundation by proper custodian. Minnick admits, however, that the records were certified. The California records are a summary of the court records certified by the trial judge where Minnick was committed and sentenced for assault with a deadly weapon. This Court has approved admitting these kinds of records as proof of a prior conviction. See DeBussi v. State, 453 So.2d 1030, 1031 (Miss. 1984); Lovelace v. State, 410 So.2d 876, 878 (Miss. 1982). The Mississippi record was a certified copy of the judgment of conviction where Minnick plead guilty to a robbery charge and was sentenced to eight years (the sentence Minnick was serving when he escaped from the Clarke County Jail). This Court has regularly upheld proof of prior convictions made by certified copies of judgments of conviction. See Debussi, 453 So.2d at 1031 and cases cited therein.
Minnick raises on appeal a different objection to these records  that there is not proof that the Robert S. Minnick on the records was the same Robert S. Minnick on trial. Aside from the problem that Minnick is barred from raising this issue on different grounds from his objection below, Livingston v. State, 525 So.2d 1300, 1303 (Miss. 1988), the state elicited testimony from Deputy Sheriff Denham that he had personally retrieved these records of prior conviction for the district attorney and knew that Robert S. Minnick was one and the same at trial as in those records. Denham also supervised Clarke County Jail and knew Minnick to be the same one sentenced for robbery as represented by the Mississippi records. This testimony went unrebutted at trial. Therefore, this assignment of error is without merit.

H. Aggravating Circumstances.

1. Stacking.

Minnick filed a motion to prohibit the state from using as aggravating factors that the crime was committed during the course of a robbery and that the crime was committed for pecuniary gain. The argument is the familiar "stacking" argument that the state can elevate murder to felony murder and then, using the same circumstances, can elevate the crime to capital murder with two aggravating circumstances. As pointed out in Lockett v. State, 517 So.2d 1317, 1337 (Miss. 1987), *97 this Court has consistently rejected this argument. See also Jones v. State, 517 So.2d 1295, 1300 (Miss. 1987); Wiley v. State, 484 So.2d 339, 351 (Miss. 1986). The United States Supreme Court, in Lowenfield v. Phelps, 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988), held that the fact that the sole aggravating circumstance found by the jury in its penalty decision was identical to an element of the underlying offense did not violate the Eighth Amendment. Lowenfield, 484 U.S. at ___, 108 S.Ct. at 555, 98 L.Ed.2d at 583. This assignment of error is without merit.

2. "Especially Heinous, Atrocious or Cruel."

Two identical jury instructions, SS-5 and SS-6, were submitted, one for the killing of Thomas and one for the killing of Lafferty, in which six aggravating circumstances were outlined which the jury could consider. One of the aggravating circumstances was the "especially heinous, atrocious or cruel" aggravating circumstances set out in Miss. Code Ann. § 99-19-101 (Cumm.Supp. 1987). Minnick argues that the jury was not properly instructed as to this aggravating circumstance so that it narrows the class of convicted murderers who may receive the death penalty  in other words, the aggravating circumstance is unconstitutionally vague. He directs this Court's attention to the recent United States Supreme Court case of Maynard v. Cartwright, 486 U.S. 356, 108 S.Ct. 1853, 100 L.Ed.2d 372 (1988), as controlling this issue. In Maynard the United States Supreme Court held the "especially heinous, atrocious or cruel" aggravating factor to be unconstitutionally vague and violative of the Eighth Amendment where the jury was not given a limiting instruction. However, the sentencing jury in the present case was given a limiting instruction as to the meaning of "especially heinous, atrocious or cruel." Therefore, in this case, the "especially heinous, atrocious or cruel" aggravating circumstance, with the limiting instruction, was not unconstitutionally vague, as contemplated by the Maynard decision. This assignment of error is without merit.

I. The Court Erred in Instructing the Jury to Make a Finding as to Whether or Not Minnick Intended that a Killing Take Place and as to Whether or Not Minnick Contemplated that Lethal Force Be Used.
Minnick argues that the evidence was insufficient to support the two findings that the jury made that Minnick intended that a killing take place or that he intended that lethal force be used. The jury was instructed, as to each victim, that it should make findings as set out in Miss. Code Ann. § 99-19-101(7) (Cum.Supp. 1987) as to whether or not:
(a) the defendant actually killed, (b) the defendant attempted to kill, (c) the defendant intended that a killing take place, (d) the defendant contemplated that lethal force be used.
Minnick first argues under the Weathersby Rule, Weathersby v. State, 165 Miss. 207, 147 So. 481 (1933), which states that "where the defendant is the only eyewitness to a homicide, his version, if reasonable, must be accepted as true, unless substantially contradicted in material particulars by a credible witness or witnesses for the state, or by the physical facts or by the facts of common knowledge." Id. at 209, 147 So. at 482. See also Jordan v. State, 513 So.2d 574, 579 (Miss. 1987); Alford v. State, 508 So.2d 1039, 1041 (Miss. 1987); Wetz v. State, 503 So.2d 803, 808 (Miss. 1987). Minnick contends that the only evidence of the actual killings came from his alleged confession, and that his version of what happened must be accepted as true. Minnick's reliance on the Weathersby Rule is totally misplaced in the context of the jury's findings under our death penalty sentencing statute. The Weathersby Rule is applicable only in the context of whether or not the defendant killed with malice or intent; in other words, is there sufficient evidence to prove that defendant killed with malice or intent where his version of the incident as the only eyewitness, says otherwise. See *98 Wetz, 503 So.2d at 808. Where the trial on a capital offense has reached the sentencing phase, defendant's guilt has been found and Weathersby considerations are no longer applicable.
Minnick further argues that under Enmund v. Florida, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982) (which is still controlling in Mississippi by virtue of the required statutory findings the jury must make, rather than the recent standard of "culpable mental state of reckless disregard for human life" set out in Tison v. Arizona, 481 U.S. 137, 107 S.Ct. 1676, 95 L.Ed.2d 127 [1987]), there is insufficient evidence to support these two jury findings. This Court faced a similar argument in Leatherwood v. State, 435 So.2d 645, 655 (Miss. 1983), where the defendant argued under Enmund that the death penalty could not be imposed upon a "non-trigger man" unless there is proof that the defendant killed, attempted to kill, or intended to kill the victim. Id. at 656. This Court found that the Leatherwood situation did not fall within Enmund's holding  Enmund did not participate in the actual robbery nor was he present when the murder was committed, while Leatherwood participated in the robbery and was present when the murder was committed. Id. The present case likewise does not fall within Enmund's holding, since Minnick actually participated in the robbery and was present in some role while both murders were committed, such that the jury could reasonably find that Minnick intended the killings and intended that lethal force be used.
This assignment of error is without merit.

J. The Prosecutor Made Improper Closing Argument.
This argument is a continuation of the argument Minnick made under the guilt phase. Specifically, Minnick objects to the following comments made by the prosecutor at closing argument of the penalty phase:
(1) That the death penalty preserves life because it deters crime.
No objection was made to this comment.
(2) That robbery is proved.
Objection was made and overruled.
(3) That the defendant wants mercy. What mercy did these two men get?
This comment was not objected to.
(4) That any other verdict would be a charade to justice.
Objection was made and overruled.
(5) That Minnick has had three fair trials (for two murders and robbery).
No objection was made to this comment.
(6) That the only way to control Robert S. Minnick is to sentence him to death.
No objection was made to this comment.
(7) That Minnick went to New Orleans to sell the guns.
No objection was made to this comment.
(8) Where was the leniency for Thomas Lafferty and their families? If you have a tear to shed, shed it for these two individuals.
No objection was made to this comment.
The state, of course, argues that as to those comments for which no objection was made, procedural bar applies. See Cole v. State, 525 So.2d 365, 369 (Miss. 1987). Procedural bar would apply to comments (1), (3), (5), (6), (7) and (8). Comment (2) was a statement summarizing the evidence  that there is evidence to prove robbery, which the jury already decided since it returned a guilty verdict. Comment (4) could be characterized as a rhetorical statement to persuade the jury to return a death penalty.
Aside from the procedural bar, the comments taken as a whole do not argue an impermissible factor or go outside the record. They seem to fall within the wide latitude afforded counsel in closing argument, as discussed earlier in this opinion. Therefore, this assignment of error is without merit.

K. Ineffective Assistance of Counsel.
Minnick alleges that he was denied his Sixth Amendment right to counsel at *99 penalty phase because his attorney committed unprofessional errors sufficient to effect the outcome of the penalty phase. It is interesting to note that Minnick is represented on appeal by the same attorney who represented him at trial (in essence, the attorney is claiming his own ineffectiveness). In any event, Minnick alleges specifically that
(1) No mercy instruction was tendered.
(2) No objections were made by defense counsel to improper argument by the district attorney.
(3) Defense counsel failed to object to two aggravating circumstances which did not fit Minnick's case.
Minnick does not specifically allege whether or not these omissions would have changed the outcome of the sentencing phase.
The applicable test is Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which this Court has applied on numerous occasions. See, e.g., Byrd v. State, 522 So.2d 756, 760 (Miss. 1988); Reynolds v. State, 521 So.2d 914, 918 (Miss. 1988); Carney v. State, 525 So.2d 776, 780 (Miss. 1988); Cabello v. State, 524 So.2d 313, 315 (Miss. 1988); Wiley v. State, 517 So.2d 1373, 1382 (Miss. 1987); Merritt v. State, 517 So.2d 517, 520 (Miss. 1987); Faraga v. State, 514 So.2d 295, 308 (Miss. 1987). The Strickland test is two-pronged: first, the defendant must show that counsel's performance was deficient. As stated in Faraga, 514 So.2d at 306, "counsel's conduct, viewed as of the time of the actions taken, must have fallen outside of a wide range of reasonable professional assistance." On the record as a whole, Minnick's counsel was diligent, tenacious, persistent, and conscientious in his defense of Minnick. These three omissions cannot fairly be characterized as incompetence. At trial, it should be remembered that Minnick's confession had been admitted into evidence. By sentencing phase, the jury had already returned a verdict of guilty. Defense counsel effectively argued mercy to the jury in his closing argument; he also effectively argued that the evidence did not fit any of the aggravating circumstances. His closing argument took advantage of the wide latitude afforded attorneys in closing argument such as to counter-balance the wide latitude taken by the state in closing argument. In essence, these three omissions were counter-balanced by the attorney's closing argument such that the jury's consideration of any of these three ideas was not impaired.
The second prong of the Strickland test is that a defendant must show that the deficient performance was prejudicial. This prong requires a showing "that there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694, 104 S.Ct. at 2068. There is nothing in the record to suggest that these three omissions prejudiced Minnick to the point that there is a reasonable probability that the outcome would have been different. Minnick has not met either prong of the Strickland test and, therefore, this assignment of error is without merit.

CONCLUSION
Having reviewed the record as submitted from the Circuit Court of Lowndes County, Mississippi, we find no reversible error therein.
Pursuant to Miss. Code Ann. § 99-19-105(3)(a), (b), (c) and (5) (Cum. Supp. 1987), and the decisions of both this Court and the Federal courts on the imposition of the death penalty, we have reviewed the record in this case and compared it to the death sentences imposed in the cases decided by this Court since Jackson v. State, 337 So.2d 1242 (Miss. 1976), which cases are set forth in Appendix A. Having engaged in this comparison, we now hold that the punishment of death in this case is not too great when the aggravating and mitigating circumstances are weighed against each other, and we are satisfied that the death penalty will not be wantonly or freakishly imposed here.
We conclude that the death sentence in this case was not imposed under the influence *100 of passion, prejudice, or any other arbitrary factor; that the evidence supports the jury's finding of statutory aggravating circumstances under § 99-19-101 and that the sentence of death is not excessive or disproportionate to the penalty imposed in other cases, considering the defendant, a jailed habitual offender who escaped from jail, the crime, a double homicide, and the manner in which the crime was committed, in the course of a robbery to acquire money, a vehicle and guns, along with the kidnapping and tying up of two young girls; that the death penalty imposed upon Minnick is consistent with similar cases; and that the sentencing phase of the trial provided a meaningful basis for distinguishing the few cases in which the death penalty is imposed from the many cases in which it is not.
We affirm both the guilt phase and the sentencing phase of this trial and, therefore, affirm the conviction of Robert S. Minnick on charges of capitol murder and the imposition of the death penalty. The date of Wednesday, January 18, 1989, is set as the date of execution of the sentence and infliction of the death penalty in the manner provided by law.
AFFIRMED.
ROY NOBLE LEE, C.J., HAWKINS, P.J., and PRATHER, SULLIVAN, ANDERSON, GRIFFIN and ZUCCARO, JJ., concur.
ROBERTSON, J., dissenting with separate written opinion.

APPENDIX A

DEATH CASES AFFIRMED BY THIS COURT:
Nixon, Sr. v. State, 533 So.2d 1078 (Miss. 1987)
Williams v. State, 544 So.2d 782 (Miss. 1987)
Lockett v. State, 517 So.2d 1317 (Miss. 1987)
Lockett v. State, 517 So.2d 1346 (Miss. 1987)
Faraga v. State, 514 So.2d 295 (Miss. 1987)
Cole v. State, 525 So.2d 365 (Miss. 1987)
Jones v. State, 517 So.2d 1295 (Miss. 1987)
Wiley v. State, 484 So.2d 339 (Miss. 1986)
Johnson v. State, 477 So.2d 196 (Miss. 1985)
Gray v. State, 472 So.2d 409 (Miss. 1985)
Cabello v. State, 471 So.2d 332 (Miss. 1985)
Jordan v. State, 464 So.2d 475 (Miss. 1985)
Wilcher v. State, 455 So.2d 727 (Miss. 1984)
Billiot v. State, 454 So.2d 445 (Miss. 1984)
Stringer v. State, 454 So.2d 468 (Miss. 1984)
Dufour v. State, 453 So.2d 337 (Miss. 1984)
Neal v. State, 451 So.2d 743 (Miss. 1984)
Booker v. State, 449 So.2d 209 (Miss. 1984)
Wilcher v. State, 448 So.2d 927 (Miss. 1984)
Caldwell v. State, 443 So.2d 806 (Miss. 1983)
Irving v. State, 441 So.2d 846 (Miss. 1983)
Tokman v. State, 435 So.2d 664 (Miss. 1983)
Leatherwood v. State, 435 So.2d 645 (Miss. 1983)
Hill v. State, 432 So.2d 427 (Miss. 1983)
Pruett v. State, 431 So.2d 1101 (Miss. 1983)
Gilliard v. State, 428 So.2d 576 (Miss. 1983)
Evans v. State, 422 So.2d 737 (Miss. 1982)
King v. State, 421 So.2d 1009 (Miss. 1982)
Wheat v. State, 420 So.2d 229 (Miss. 1982)
Smith v. State, 419 So.2d 563 (Miss. 1982)
Johnson v. State, 416 So.2d 383 (Miss. 1982)
Edwards v. State, 413 So.2d 1007 (Miss. 1982)
Bullock v. State, 391 So.2d 601 (Miss. 1980)
Reddix v. State, 381 So.2d 999 (Miss. 1980)
Jones v. State, 381 So.2d 983 (Miss. 1980)
Culberson v. State, 379 So.2d 499 (Miss. 1979)
Gray v. State, 375 So.2d 994 (Miss. 1979)
Jordan v. State, 365 So.2d 1198 (Miss. 1978)
Voyles v. State, 362 So.2d 1236 (Miss. 1978)
Irving v. State, 361 So.2d 1360 (Miss. 1978)
Washington v. State, 361 So.2d 61 (Miss. 1978)
Bell v. State, 360 So.2d 1206 (Miss. 1978)

*101 DEATH CASES REVERSED AS TO GUILT PHASE AND SENTENCE PHASE:
West v. State, 519 So.2d 418 (Miss. 1988)
Houston v. State, 531 So.2d 598 (Miss. 1988)
Davis v. State, 512 So.2d 1291 (Miss. 1987)
Williamson v. State, 512 So.2d 868 (Miss. 1987)
Smith v. State, 499 So.2d 750 (Miss. 1986)
West v. State, 485 So.2d 681 (Miss. 1985)
Fisher v. State, 481 So.2d 203 (Miss. 1985)
Johnson v. State, 476 So.2d 1195 (Miss. 1985)
Fuselier v. State, 468 So.2d 45 (Miss. 1985)
West v. State, 463 So.2d 1048 (Miss. 1985)
Jones v. State, 461 So.2d 686 (Miss. 1984)
Moffett v. State, 456 So.2d 714 (Miss. 1984)
Lanier v. State, 450 So.2d 69 (Miss. 1984)
Laney v. State, 421 So.2d 1216 (Miss. 1982)

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR RESENTENCING TO LIFE IMPRISONMENT:
White v. State, 532 So.2d 1207 (Miss. 1988)
Edwards v. State, 441 So.2d 84 (Miss. 1983)
Dycus v. State, 440 So.2d 246 (Miss. 1983)
Coleman v. State, 378 So.2d 640 (Miss. 1979)

DEATH CASES REVERSED AS TO PUNISHMENT AND REMANDED FOR A NEW TRIAL ON SENTENCING PHASE ONLY:
Stringer v. State, 500 So.2d 928 (Miss. 1986)
Pinkton v. State, 481 So.2d 306 (Miss. 1985)
Mhoon v. State, 464 So.2d 77 (Miss. 1985)
Cannaday v. State, 455 So.2d 713 (Miss. 1984)
Wiley v. State, 449 So.2d 756 (Miss. 1984)
Williams v. State, 445 So.2d 798 (Miss. 1984)
ROBERTSON, Justice, dissenting:

I.
We have a rule that seems to work well in civil cases. A lawyer is forbidden to communicate with the opposing party who has a lawyer without that lawyer being present. At the very least he must give notice of his intentions to or obtain consent of opposing counsel. This rule is undergirded by an ethical principle.[1] All accept that a lawyer who approaches a represented third party without going through counsel should be severely sanctioned. And this is so though the lawyer uses a lay representative or paralegal to do his dirty work.[2]
Think what we would do in a personal injury case. The injured party is represented and has been engaged in settlement negotiations with the prospective defendant and his lawyer. Unbeknownst to plaintiff's lawyer, defense counsel's paralegal investigator approaches plaintiff and emerges with a settlement agreement for a sum substantially less than counsel had been demanding. Or, suppose the investigator obtained a(n oral) statement that compromises plaintiff's case.[3] We know well what would happen, the only point of mystery being whether defense counsel would be shot or flogged.
We regard this rule a fair one. Its genesis lies in our concern with fairness. That *102 the third party has a lawyer is taken as an expression of his wish to be dealt with only through counsel. There is substantial probability of the party being overreached when his lawyer is not there. The integrity of the lawyer-client relationship is at stake.
I know of no basis for assuming that a prosecuting attorney is exempt from these rules. Indeed, the district attorney has a special responsibility for assuring that the accused has counsel and is not taken unfair advantage of.[4] We have recognized in a variety of contexts that the knowledge and conduct of law enforcement authorities are imputed to the prosecuting attorney as representative of the state. See, e.g., White v. State, 498 So.2d 368, 370 (Miss. 1986); Foster v. State, 484 So.2d 1009, 1011 (Miss. 1986); Fuselier v. State, 468 So.2d 45, 56 (Miss. 1985). By analogy, Deputy Sheriff Denham was the agent and alter ego of the district attorney when he went to San Diego to interview Minnick. See People v. Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 422, 348 N.E.2d 894, 898 (1976).
If I understand the facts correctly, Minnick was taken into custody and placed in jail in San Diego, California, on August 22, 1986. He was interviewed by an FBI agent on August 23. At that time, according to the majority, "Minnick answered some questions, but then ceased to answer, saying, "Come back Monday when I have a lawyer." After the FBI interview but before Deputy Denham arrived, a lawyer was furnished to Minnick, apparently a San Diego public defender, who, according to the majority, "told him not to speak to anyone else about any of the charges against him."[5] Under these facts we need not engage in the familiar metaphysics of attachment of the right to counsel. The right had attached. See Nicholson v. State, 523 So.2d 68, 76-77 (Miss. 1988); May v. State, 524 So.2d 957, 967 (Miss. 1988); Jimpson v. State, 532 So.2d 985, 988-89 (Miss. 1988); see also Page v. State, 495 So.2d 436, 439-42 (Miss. 1986); Cannaday v. State, 455 So.2d 713, 722 (Miss. 1984). Minnick had "invoked" his right to counsel and had been furnished counsel before Deputy Sheriff Denham arrived at his San Diego jail cell.[6] Knowledge of these facts was imputed to Denham. Arizona v. Roberson, 486 U.S. 675, ___, 108 S.Ct. 2093, 2101, 100 L.Ed.2d 704, 717 (1988). Whatever protections the right affords were Minnick's to enjoy. Page v. State, 495 So.2d 436, 439-42 (Miss. 1986).
The facts before us, imagine this scenario. The day before trial the district attorney, or some representative of the prosecution force, e.g., a deputy sheriff, visits Minnick in his jail cell. This is done without so much as a "By your leave" or "Kiss my foot" to Minnick's lawyer. The district attorney says, "Mr. Minnick, your trial begins tomorrow and there are a few points I want to clear up before the trial begins." Assume then that the district attorney (or his representative) reads Minnick the standard Miranda warnings and without obtaining any express acknowledgment or waiver, written or oral, proceeds to ask Minnick questions, to which Minnick responds. Assume further that Minnick is not told "Now, Mr. Minnick, we know that Mr. Gates is your lawyer and perhaps you ought to talk to him before we interview you;" all that is said to Minnick is the bare minimum required by Miranda. I cannot imagine that we would allow use at trial of the fruits of such a pre-trial interview. See People v. Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 422-24, 348 N.Ed.2d 894, 898-99 (1976). What I can imagine is the language with which this Court would unanimously condemn such a shoddy practice.
How is that different from what we have here? Minnick's entitlement to the protections of counsel were not lesser on August *103 25, 1986, than on the day before trial. I know of no principled basis for saying that the shield of counsel and Minnick's right thereto was less potent on August 25 than on the day before trial.
The implicit premise of the majority opinion is that the accused's right to counsel and privilege against self-incrimination are in the jailhouse like a child at birth, alive and well but rather incompetent and defenseless, growing into a mature adult-like right only come trial time. But what in logic or law or life suggests the right to counsel ought be so regarded? The apt analogy is the full grown Minerva who sprang from the head of Zeus. The right to counsel is as full grown at the moment of attachment as it will ever be, as available to the accused then as ever, and at each point thereafter where there exists a possibility for irremedial prejudice to the accused, for once the confession is obtained, the prosecution is generally a downhill proposition. There is no more critical stage than where a confession is sought.

II.
Courts ought enforce those rules emanating from the best reading that may be given the principles that fit and justify the positive law of the state. That law ought be seen as an organic whole. The positive law possessing power this day ranges from the privilege against self-incrimination and right to counsel embedded in Article 3, Section 26 of the Mississippi Constitution of 1890, across statute and case law to Rules 1.02-1.05 of our Uniform Criminal Rules of Circuit Court Practice.
The principles which fit and provide the best, albeit far from perfect, justification for our positive law today include at least these four: (1) at each encounter following custody, the individual should be treated fairly;[7] (2) because of the realities of the criminal justice system, the accused is ordinarily weaker than the prosecution and needs special protection to assure fairness; (3) confessions are not the preferred form of evidence in a criminal prosecution; and (4) the accused should have counsel at all critical stages of the proceedings against him. I say these principles are embedded in our positive law in the sense that no honorable and rational person who rejected these principles in any significant way could possibly have written the rules in the field  again from Section 26 of our bill of rights to the pre-trial provisions of our rules of criminal practice.
If the efficacy of our criminal justice system depends upon the accused not asserting or enjoying his claims and protections regarding access to counsel, then there is something very wrong with that system. I dare say no one can divine a policy of preference for ignorance or waiver in the valid rules in the field. No such policy fits the text of our rules in the field much less provides the best justification for the existence of those rules today. No one who believed that the efficacy of the criminal justice system ought depend upon a preference for ignorance of the accused or waiver of his right to counsel could possibly have written our law as it is; hence, the law cited by the majority cites  but then ignores  that there is a strong presumption against waivers of the protections of counsel.[8]
*104 What we have said above regards the substance of the right to counsel. There is a separate and important concern regarding the form of that rule. Our law does no one a favor when it provides fuzzy rules in plastic form. Where tensions are high, controversy great, and much at stake (and there is never more at stake than in a case of capital murder), the need for bright line rules is at its highest. The form of the rule formally realizing the accused's right to counsel should provide an identifiable line between what may be done and what may not. All should be told that, once the right to counsel has attached, the accused may be dealt with only through counsel. Such clarity in expression is as important to law enforcement as to the citizen. See Arizona v. Roberson, 486 U.S. 675, ___, 108 S.Ct. 2093, 2097, 100 L.Ed.2d 704, 713 (1988). This is no novel idea. Did not even Miranda say as much?[9]
We have this sort of rule in civil cases. It seems to work well. Its predicate is fairness. If such a rule obtains in civil cases, where there is no constitutional right to counsel, what reason on principle can there be for denying a like rule in a criminal case where there is such a right?[10] If the rule obtains in civil cases where mere money is at stake, why not where the executioner approaches?
I respectfully dissent.
GRIFFIN, J., not participating.
NOTES
[1] Minnick's testimony on this point was as follows:

Q: Did you ever ask to stop talking to the FBI man?
A: As I was saying, they drilled me on several questions of the incident and I told them about leaving the jail and that's all I told them. I told them I had to have a lawyer before I was able to make any statements about anything and I told them I was not signing any rights waiver or I was not signing anything because I had to have a lawyer to talk with before I could talk to any law official.
Q: What was your lawyer that you talked to  name?
A: I don't recall his name.
Q: How long did you talk to him?
A: I talked to him two different times and  it might have been three different times  but I talked to him the day he told me the next day he would get the court order. He told me that first day that he was my lawyer and that he was appointed to me and to not talk to nobody and not tell nobody nothing and to not sign no waivers and not sign no extradition papers or sign anything and that he was going to get a court order to have any of the police  I advised him of the FBI talking to me and he advised me not to tell anybody anything that he was going to get a court order drawn up to restrict anybody talking to me outside of the San Diego Police Department.
[2] Minnick testified at the suppression hearing on this point unequivocally:

A: I give no direct statement of any kind concerning any murder charges or anything being on the run with Monkey Dyess, nothing that is on paper which I have read. Everything is put down, I advised this, I advised that, I advised this, I advised that. They have no signature and no coercing ears that can say that I give any sort of statement of any kind freely or voluntary to any police officer for anything. I refused and I deny anything put down on paper being that I said so and so, except and excluding the immediate escape from the county jail, which I will state I fully to the best of my knowledge I did escape from the county jail. They have me dead to rights on that and there is no way around it... .
[3] On cross-examination on this point, Minnick responded:

Q: Sit down and I'll ask you some questions. Now, Mr. Minnick, pertaining to your rights form, you know what the Miranda Rights are, don't you?
A: That I had a right to remain silent and so on and so forth?
Q: Yes.
A: I have heard it spoke to me before on several occasions.
* * * * * *
Q: Deputy Denham did inform you of your rights, didn't he?
A: I can't recall exactly what he said but he recited something he called rights to me and I was not able to read anything of rights waiver or any  you know  because he had no paperwork whatsoever.
Q: You stated to him you refused to sign a waiver of rights but you were willing to talk to him, didn't you?
A: Not exactly those words. I told him  well, actually it was nothing official at all and there weren't no statements official from him in any kind of way. We went through several different conversations about  first, about how everybody was back in the county jail and what everybody was doing, had he heard from Mama and had he went and talked to Mama and had he seen my brother, Tracy, and several different other questions pertaining to such things as that. And, we went off into how the escape went down at the county jail... .
Q: And, then you got into what happened when Lafferty and Thomas were killed, didn't you?
A: I have no comments on that and I stand on the Fifth Amendment.
[1] See Rule 4.2 of Mississippi Rules of Professional Conduct, effective July 1, 1987, entitled "Communication with person represented by counsel."

In representing a client, a lawyer shall not communicate about the subject of the representation with a party the lawyer knows to be represented by another lawyer in the matter, unless the lawyer has the consent of the other lawyer or is authorized by law to do so.
[2] See Rule 5.3, Miss.R.Prof.Conduct.
[3] See Bruske v. Arnold, 44 Ill.2d 132, 254 N.E.2d 453, 455 (1969); see also Trans-Cold Express, Inc. v. Arrow Motor Transit, Inc., 440 F.2d 1216, 1219 (7th Cir.1971).
[4] See Rule 3.8, Miss.R.Prof.Conduct.
[5] This fact is not in the record. It was conceded, however, by Minnick's appellate counsel at oral argument.
[6] In a very real sense this case begins the "day after" Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981). Today's concern is the case scenario after the Edwards accused has established an attorney-client relationship with a lawyer albeit in this instance an out of state public defender.
[7] For instance, the section of our constitution dealing with the right to counsel, Article 3, § 26, is a "positive command, and without it due process of law is impossible." Stewart v. State, 229 So.2d 53, 55 (Miss. 1969). See also Waldrop v. State, 506 So.2d 273, 275 (Miss. 1987) ("This Court has embraced a right to ... counsel inherent in the due process clause of the state constitution."); Reed v. State, 430 So.2d 832, 837 (Miss. 1983).
[8] See Michigan v. Jackson, 475 U.S. 625, 633, 106 S.Ct. 1404, 89 L.Ed.2d 631, 640 (1986); Johnson v. Zerbst, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461, 1466 (1938). A waiver ought be accepted only if made with full awareness of "the dangers and disadvantages of self-representation," Faretta v. California, 422 U.S. 806, 835, 95 S.Ct. 2525, 2541, 45 L.Ed.2d 562 (1975); see also Adams v. United States ex rel. McCann, 317 U.S. 269, 279, 63 S.Ct. 236, 241, 87 L.Ed. 268 (1942) (accused "may waive his constitutional right to assistance of counsel if he knows what he is doing and his choice is made with his eyes open"). Indeed, "courts indulge in every reasonable presumption against waiver," Brewer v. Williams, 430 U.S. 387, 404, 97 S.Ct. 1232, 1242, 51 L.Ed.2d 424, 440 (1977). I am no devotee of subjective standards within our law. Still it takes little awareness or common sense to realize that objectively adequate warnings by an opposing party, whether detailed or cursory, simply cannot satisfy this high standard.
[9] "If the individual states that he wants an attorney, the interrogation must cease until an attorney is present." Miranda v. Arizona, 384 U.S. 436, 474, 86 S.Ct. 1602, 1628, 16 L.Ed.2d 694, 723 (1966).
[10] State v. Sparklin, 296 Or. 85, 672 P.2d 1182, 1187 (1983); People v. Hobson, 39 N.Y.2d 479, 384 N.Y.S.2d 419, 422, 348 N.E.2d 894, 898 (1976).